Ronnie Lee GARDNER, Plaintiff,
Appellee, and Cross–
Appellant,

v.

Tamara HOLDEN, Warden of the Utah
State Prison, State of Utah, Defendant,
Appellant, and Cross–Appellee.

No. 910500.

Supreme Court of Utah.

Nov. 10, 1994.

Rehearing Denied Feb. 8, 1995.

Manny C. Garcia, Salt Lake City, and Craig L. Truman, Denver, CO, and Karen A. Chaney, Tempe, AZ, for plaintiff.

R. Paul Van Dam, Atty. Gen., Charlene Barlow, Asst. Atty. Gen., Salt Lake City, for defendant.

STEWART, Associate Chief Justice:

A jury convicted Ronnie Lee Gardner of first degree murder, attempted first degree murder, aggravated kidnapping, escape, and possession of a dangerous weapon by an inmate. He was then sentenced to death. His conviction and sentence were affirmed on direct appeal in *State v. Gardner*, 789 P.2d 273 (Utah 1989), *cert. denied*, 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 965 (1990).

Gardner filed this petition for post-conviction relief in district court, challenging both his conviction and his sentence. The district court ruled that Gardner had been denied effective assistance of counsel in the penalty hearing and on appeal because trial counsel did not give a defense psychiatrist adequate time to test and evaluate Gardner and because appointed appellate counsel did not adequately research and brief issues on appeal. The court held that these deficiencies entitled Gardner to a new penalty hearing and a new appeal.

On appeal, the State argues that counsel's performance was not deficient and, alternatively, that any alleged deficiencies were not prejudicial. Gardner cross-appeals, arguing that his conviction should have been set aside and that the district court erred in rejecting his other claims of error.

## I. FACTS

The facts developed at the trial and at the hearing on the petition for post-conviction relief are as follows: On April 2, 1985, Ronnie Lee Gardner was transported from the Utah State Prison to the Metropolitan Hall of Justice in Salt Lake City for a pretrial hearing on a second degree murder charge. As Gardner and his guards entered the courthouse basement, a woman handed Gardner a gun. The guards exchanged gunfire with Gardner, shot him through the lung, and then retreated from the area. In attempting to escape, Gardner entered the archives room, where he saw two attorneys, Robert Macri and Michael Burdell, hiding behind the door. Gardner pointed the gun at Macri and cocked the hammer of the gun. Burdell exclaimed, "Oh, my God!" Turning, Gardner shot and killed Burdell.

Gardner then forced prison officer Richard Thomas, who was also in the basement, to conduct him out of the archives room to a stairwell leading to the second floor. As Gardner crossed the lobby, he shot and seriously wounded Nick Kirk, a uniformed bailiff. Gardner climbed the stairs to the next floor, where he took hostage Wilburn Miller, a vending machine serviceman. As Gardner exited the building, Miller broke free and escaped. Outside, Gardner threw down his gun and surrendered to waiting police officers.

Gardner's attorneys, brothers Andrew and James Valdez of Salt Lake Legal Defenders Association, were to meet Gardner that day at 9:00 a.m. for the pretrial hearing. Andrew Valdez was walking toward the courthouse when he saw Gardner go down to the ground. As Andrew ran across the street, he could see that Gardner was bleeding from the chest. Andrew spoke with Gardner and then left. James Valdez arrived at the courthouse soon after. He immediately approached Gardner and asked him if he was all right; Gardner responded that he was in pain.

Gardner was later transported to the University Hospital. Wayne Jorgensen, a prison officer assigned to guard Gardner at the hospital, testified at trial that Gardner told him he shot Burdell because he thought Burdell looked as if he would jump on him.

According to Jorgensen, Gardner also declared that he would have killed anyone who tried to stop him from escaping.

Both Andrew and James Valdez represented Gardner at trial. The thrust of the defense was that Gardner was in such pain and physical distress after he was wounded that his shooting Burdell was only a reaction and therefore the killing was unintentional. In preparation for trial, defense counsel spoke with the emergency room doctors who treated Gardner. The doctors told counsel that Gardner was not in shock when he came into the emergency room, did not have excessive bleeding, was lucid and demanding, and was aware of the situation.

Robert Macri testified at trial that after Gardner shot Burdell, Macri ran around the door and closed it behind him as a shield. However, at the preliminary hearing, Macri testified that he could not remember how the door shut. After the preliminary hearing but before trial, unknown to either the prosecution or defense counsel, Macri underwent hypnosis to help him remember how the door shut. Macri could not recall that detail while under hypnosis but asserted that while driving to California some months later, he suddenly recalled that he had shut the door. In all other respects, Macri's testimony at the preliminary hearing and at trial were the same. It was at the post-conviction proceeding while Gardner's appeal was pending that defense counsel first became aware that Macri had been hypnotized prior to trial.

At trial, Gardner took the stand and testified on direct examination that he had been convicted of various crimes, including crimes of violence. Defense counsel elicited this information, according to the testimony at the habeas hearing, because he believed that the prosecution would use those convictions to impeach Gardner and he wanted to "steal the prosecution's thunder."

At the penalty hearing, defense counsel called Dr. Heinbecker, a psychiatrist, to testify regarding Gardner's mental status. On the basis of Gardner's medical history and previously administered psychological and I.Q. tests, Dr. Heinbecker testified that it was likely that Gardner suffered from organ-

ic brain damage. The prosecution challenged that diagnosis with other prior psychological evaluations performed on Gardner. However, Dr. Heinbecker had only twenty-four hours to prepare for testifying. His preparation consisted of interviewing Gardner, Gardner's mother, and Gardner's brother and reviewing Gardner's previous medical and psychological records. Dr. Heinbecker did not administer any psychological tests to Gardner but relied on tests administered by prison psychologists and others.

On direct appeal from the conviction and sentence, the Salt Lake Legal Defenders' Association (LDA) continued to represent Gardner. However, after LDA's brief was filed, Gardner filed a pro se supplemental brief alleging ineffective assistance of counsel at trial. A few days before oral argument, Gardner asked LDA to withdraw as his attorneys. As a result, LDA moved to withdraw three days before oral argument. The Court denied the motion to withdraw but appointed attorney Ed Brass to file a supplemental brief for Gardner on his ineffectiveness-of-counsel claim and permitted Gardner to supplement his brief and the oral argument of LDA. The supplemental brief asserted that trial counsel were ineffective in failing to object to the admission of certain testimony but stated that other claims of ineffectiveness of counsel were premature because there was no record upon which to base a review.

## II. HABEAS REVIEW

Gardner raised numerous issues in his petition for post-conviction relief, and the district court addressed the merits of all of them. The issues a petitioner may properly raise in a petition for post-conviction relief, however, are limited. Rule 65B(b) of the Utah Rules of Civil Procedure provides for post-conviction relief for those who have been wrongfully imprisoned due to "a substantial denial of rights." Nevertheless, the rules that govern a Rule 65B proceeding limit the kinds of issues that can properly be raised and considered.

██ A petition for post-conviction relief, or habeas corpus, collaterally attacks a conviction and/or a sentence. It is not a substitute for direct appellate review. *Codianna v. Morris,* 660 P.2d 1101, 1104 (Utah 1983). Issues raised and disposed of on direct appeal of a conviction or a sentence cannot properly be raised again in a Rule 65B proceeding, *Hurst v. Cook,* 777 P.2d 1029, 1036 (Utah 1989), and should be dismissed as an abuse of the writ without a ruling on the merits. Issues that could and should have been raised on direct appeal, but were not, may not properly be raised in a habeas corpus proceeding absent unusual circumstances. *Fernandez v. Cook,* 783 P.2d 547, 549 (Utah 1989); *Codianna,* 660 P.2d at 1104. The unusual circumstances test requires a showing of "an obvious injustice or a substantial and prejudicial denial of a constitutional right." *Hurst,* 777 P.2d at 1035; *Fernandez,* 783 P.2d at 549; *Codianna,* 660 P.2d at 1005; *Dunn v. Cook,* 791 P.2d 873, 876 (Utah 1990). "'[T]he unusual circumstances test was intended to assure fundamental fairness and to require reexamination of a conviction on habeas corpus when the nature of the alleged error was such that it would be "unconscionable not to reexamine" ... and thereby to assure that "substantial justice [was] done"....'" *Hurst,* 777 P.2d at 1035 (quoting *Codianna,* 660 P.2d at 1115 (Stewart, J., concurring)). In all events, it is not the function of a Rule 65B proceeding to allow a defendant to scour the record of the original proceeding for a technical error upon which to collaterally attack a conviction or a sentence. Ordinarily, assertions of error based on evidentiary, procedural, and instructional rulings are deemed waived under the law unless an erroneous ruling made the trial fundamentally unfair. *Id.* at 1035 n. 5. In all Rule 65B proceedings, it is the burden of the petitioner, i.e., the defendant in the initial proceeding, to plead and prove the existence of such fundamental unfairness.

On the basis of the foregoing principles, we will not review the merits of six issues that Gardner has raised in his petition for post-conviction relief; indeed, the trial court's rulings on the merits of those issues were improper. Two of the issues Gardner raises will be addressed on the merits: (1) Ineffective assistance of counsel at trial and on direct appeal; and (2) error in the habeas

proceeding in not appointing an investigator and an expert witness at state expense to assist Gardner in prosecuting his petition.

## III. ISSUES NOT ADDRESSED ON THE MERITS

Six of the issues Gardner raises could have been raised on direct appeal and were not. Those issues are (1) error by the trial court in admitting hypnotically enhanced testimony; (2) error by the trial court in not advising Gardner of his right to remain silent and not testify; (3) violation of Gardner's right to be present at all the hearings in his case; (4) consideration by the jury of impermissible information about the victim; (5) failure to instruct the jury on all the statutory mitigating circumstances in the penalty phase; and (6) failure to instruct the jury in the penalty phase that the existence of aggravating factors had to be found beyond a reasonable doubt before they could be considered in deciding to impose the death penalty.

■ None of the rulings, even if erroneous, was of such a fundamental nature as to have made the trial fundamentally unfair. Issue (1), that the trial court should not have allowed hypnotically enhanced testimony, relates only to Robert Macri's unimportant testimony that he closed the archives room door behind him when he ran out of the room. That testimony went only to a collateral issue that was, at most, marginally related to Gardner's defense. Issue (2), that the trial court should have advised Gardner of his right to remain silent and not testify, is frivolous and does not raise a claim that resulted in a substantial denial of a right. Gardner had been advised of his right not to testify by his counsel, and his decision to testify was made on advice of counsel. Issue (3), that his due process right was violated because he was not present during a hearing on a motion by co-defendant Hainsworth, is also frivolous. Gardner asserts nothing that even remotely supports the suggestion that critical proceedings were held in his absence. In fact, Gardner and his attorney attended the hearing on Hainsworth's motion to dis-

qualify the judge but left before the matter was concluded because Gardner felt ill and the trial judge had continued the hearing to a new date. Gardner attended the second hearing.

■ Issue (4) is that the jury was allowed to hear impermissible victim impact evidence. The evidence Gardner attacks was (1) Macri's testimony that he knew Burdell well and that Burdell did public service work, and (2) prosecutorial comments during closing argument that Burdell "was a human being with life's pleasures, with life's challenges and with life's opportunities before him." Gardner also attacks the prosecutor's comment that Burdell was a lawyer who did pro bono work and that Burdell had a right to live. Those statements were not "victim impact evidence" and could not have produced any unfairness, fundamental or otherwise, in the trial.

■ Issue (5) is that the trial court did not instruct the jury on all the statutory mitigating circumstances contained in Utah Code Ann. § 76–3–207(2).[1] The trial court instructed the jury on all but three of the statutory mitigating circumstances: (1) there was no significant history of prior criminal activity; (2) the defendant acted under extreme duress or under the substantial domination of another; and (3) the defendant was an accomplice in a murder committed by another person and his participation was relatively minor. There was no factual basis for any of these mitigating circumstances; there was no fundamental unfairness on this issue.

■ Finally, issue (6) is that the trial court refused to instruct the jury in the penalty phase that the existence of aggravating factors had to be proven beyond a reasonable doubt before the jury could consider any of them in deciding to impose the death penalty. However, Gardner does not now challenge any of the evidence of aggravating factors, and that evidence was essentially unchallenged at the penalty hearing. The evidence consisted largely of eyewitness accounts of Gardner's past violent acts, such as

---

1. Section 76–3–207 has been amended. The statutory mitigation circumstances are now set forth in section 76–3–207(3).

his escapes from prison and his criminal record. Even now, Gardner does not assert that the evidence was unreliable, inaccurate, or otherwise subject to question. The trial court's failure to give the instruction did not cause fundamental unfairness.

In short, these assertions of error fall far short of meeting the "unusual circumstances" test.

## IV.   INEFFECTIVE ASSISTANCE CLAIMS

Gardner alleges as a ground for post-conviction relief that he was denied his right under the Sixth Amendment to the United States Constitution to the effective assistance of counsel at trial and on appeal in the following respects: (1) trial counsels' failure to give Gardner's psychiatric expert adequate time to prepare mitigating testimony in the penalty phase; (2) failure of assigned appellate counsel, Ed Brass, to disqualify himself because of a conflict of interest arising from his representation of the woman accused of handing Gardner the gun at the courthouse and his failure to research adequately and raise issues on direct appeal; (3) trial counsels' failure to resign as counsel because they were witnesses to Gardner's condition at the time of his arrest and because of animosity between them and Gardner; (4) trial counsels' "coercion" of Gardner to testify that he had been convicted of violent crimes; (5) their failure to request a bifurcated trial to deal with an aggravated circumstance based on prior convictions; and (6) counsels' failure to introduce important evidence.[2]

Because an attorney does not usually assert a claim of ineffectiveness on appeal on his or her part with respect to an error made at trial, *Fernandez v. Cook*, 783 P.2d 547, 549–50 (Utah 1989); *Jensen v. De-Land*, 795 P.2d 619, 621 (Utah 1989), the unusual circumstances test may be satisfied when there is a claim of ineffectiveness of trial counsel and the same attorney handled both the trial and the direct appeal. *Fernandez*, 783 P.2d at 549–50; *Dunn v. Cook*, 791 P.2d 873, 878 (Utah 1990) (plurality opin-

ion); *see also Bundy v. Deland*, 763 P.2d 803, 805 (Utah 1988). To constitute ineffectiveness of counsel within the meaning of the Sixth Amendment, counsel's deficiencies must be "sufficiently grievous to deprive petitioner of the effective assistance of counsel." *Codianna v. Morris*, 660 P.2d 1101, 1105 (Utah 1983). In *Codianna*, the Court stated:

> To permit the inevitable instances of attorney oversight or ignorance to qualify for the "unusual circumstances" exception would allow that exception to swallow up the rule, thereby transforming habeas corpus from an extraordinary remedy into an alternative appeal mechanism in contravention of the finality of criminal judgments that is the settled policy of this state.

*Id.* at 1105. A claim of ineffective assistance of counsel may not, therefore, be used simply to relitigate "under a different guise" an issue already disposed of on direct appeal. *Hurst v. Cook*, 777 P.2d 1029, 1037–38 (Utah 1989).

### A.   Ineffectiveness Claims Decided Directly or in Substance on First Appeal

We turn first to Gardner's fourth, fifth, and sixth claims of ineffective assistance of counsel, which we dispose of summarily and not on the merits. Thereafter, we address, on the merits, the first three claims of ineffectiveness for reasons that will be explained.

Gardner's fourth claim of ineffective assistance was counsels' "coercion" of Gardner to testify at trial. In essence, that claim was raised and disposed of on Gardner's direct appeal when the Court rejected Gardner's assertion that the admission of his prior inconsistent statements violated his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Gardner*, 789 P.2d at 281–82. Gardner's claim now is that his attorneys coerced him to testify and that his coerced testimony led to that impeachment testimony. As an aside, we note that there is no evidence on record in this proceeding that supports any such coercion.

---

**2.** The omitted "important" evidence included ballistics evidence and the clarifying fact that

Gardner was shot in the chest through the lung, not in the shoulder, as some witnesses testified.

Gardner's claim that his counsel was ineffective because they elicited testimony from Gardner on the stand that he had been convicted of other violent crimes was also essentially disposed of on the direct appeal and has also been addressed, at least in part, above. His argument is that the evidence of his prior felony conviction made the jury "prone to convict him because of his 'bad character.'" *Id.* at 279. This Court held on direct appeal that it was error to admit that evidence but that it was not prejudicial. *Id.* at 290–91 (Zimmerman, J., concurring, joined by Stewart & Durham, JJ.). Gardner now asserts essentially the same argument under the guise of an ineffective assistance claim. Because that evidence was not prejudicial, as we have previously held, it cannot be the basis for an ineffectiveness claim.

Gardner's claim that trial counsel should have requested a bifurcated proceeding to deal with the aggravating circumstance based on a prior felony conviction was also essentially disposed of on direct appeal. The Court held that although it was error not to hold a bifurcated hearing, the failure to bifurcate did not prejudice Gardner. *Id.* at 290–91 (Zimmerman, J., concurring, joined by Stewart & Durham, JJ.). The failure to request the hearing, the specific issue raised now, is essentially the same issue as that disposed of on the first appeal. The attempt to avoid a prior ruling by a hair-splitting distinction in the statement of the issue does not invoke Rule 65B or habeas jurisdiction.

### B. Frivolous Claims

Gardner claims that trial counsel were ineffective because they failed to clarify for the jury that Gardner was shot in the chest and lung instead of in the shoulder, as some witnesses testified. That issue is frivolous as a basis for post-conviction relief. Whatever difference there may have been with respect to the shock and trauma Gardner suffered from being shot in the chest and lung rather than in the shoulder is wholly insufficient to show fundamental unfairness. The state of Gardner's consciousness and awareness was before the jury through several witnesses. The additional assertion that counsel failed to introduce ballistics evidence that might have related to the degree of shock Gardner suffered is also frivolous. Again, the jury had evidence on which it could make that judgment. In all events, the argument, even if it had merit, would fall far short of showing a denial of fundamental fairness in the trial.

### C. Ineffectiveness Claims Addressed on the Merits

We address the first three claims of ineffectiveness on the merits. They allege errors that were not addressed either directly or in substance on the first appeal and that, if factually correct, might have denied Gardner the fundamental fairness to which he was entitled in his trial, in the penalty hearing, or on his appeal from those proceedings.

In addition, the record that was developed at trial and was before this Court on the first appeal did not provide a basis for deciding those issues. Where an issue going to the fundamental fairness of a trial involves nonrecord events, Rule 65B may be the only means whereby a defendant can obtain a fair adjudication of the issue.

The issue of Brass's asserted ineffectiveness on the appeal could only be raised in a petition for post-conviction relief. In addition, the public defenders did not raise any issue as to their ineffectiveness on the direct appeal, and Brass argued that except for trial counsels' failure to object to certain testimony at the penalty phase, any ineffectiveness claim as to the public defenders was premature because there was not an adequate record. In the habeas hearing below, habeas counsel were allowed to present evidence with respect to Gardner's first three claims of ineffective assistance of counsel at trial.

We turn now to the merits of the following three ineffective assistance claims: (1) trial counsels' not allowing Gardner's psychiatric expert adequate time to prepare for the penalty phase; (2) Ed Brass's alleged "conflict of interest" with Gardner arising from his representation of the woman accused of handing Gardner the gun at the courthouse, giving rise to Brass's not adequately representing Gardner on appeal; and (3) the "conflict of interest" trial counsel allegedly had because

they were witnesses to Gardner's condition at the time of his arrest and because of the animosity that existed between Gardner and his attorneys.

### 1. Expert Preparation Theory for Penalty Phase

■ The district court vacated Gardner's death sentence and granted him a new penalty hearing because defense counsel failed to provide Gardner's expert psychiatric witness sufficient time to examine Gardner prior to testifying at the penalty hearing. The court stated in its memorandum decision:

"Effective representation of the accused in a capital case remains that counsel challenged the State's aggravating evidence and present a cohesive and understandable theory of mitigation." Petitioner contends this was not done. Primarily, there was inadequate investigation relating to petitioner's mental health prior to trial. Whatever evidence was presented was inadequate—too little and too late. There is dispute regarding Dr. Peter Heinbecker's testimony. Was there sufficient time and sufficient medical or psychological evaluations for Dr. Heinbecker to adequately and completely testify on behalf of petitioner? The Court is of the opinion there was not. Dr. Heinbecker was contacted a mere 24 hours before he testified. During that time, he "was only able to examine some of the record, interview Mr. Gardner for about one hour, and talk to his mother and brother for a total of 2.5 hours." Further, Dr. Heinbecker testified that, in a case of this significance, he would have expected more time to prepare his evaluation.

The district court also observed that although defense counsel had arranged for psychiatrist Dr. Mark Rindflesh to evaluate Gardner in May 1985, counsel did not ask him to testify for Gardner. Gardner's attorneys also asked Dr. Agnes Plenk to evaluate Gardner and to testify for him, but she also declined. The court stated:

No further effort was made to seek professional assistance for petitioner, nor seek state assistance in doing so. In addition, present counsel's efforts to secure expert testimony for petitioner's evaluation was opposed by the State and sustained by this Court. As a result, no satisfactory mental health evaluation of petitioner has ever been available to petitioner to present at any hearing.

Petitioner contends the deprivation of adequate evaluations has prevented petitioner from presenting any evidence of possible organic brain damage or other mitigating information which further prevented presentation of "a cohesive and understandable theory of mitigation." The Court agrees.

The district court did not comment either on the testimony of Dr. Heinbecker at the penalty hearing or suggest any additional evidence that might have been presented had he had more time to prepare. The Court stated only that Dr. Heinbecker's preparation time was severely limited and that in the habeas proceeding, Dr. Heinbecker testified that "in a case of this significance, he would have expected more time to prepare his evaluation." In fact, Dr. Heinbecker did not indicate that he might have produced any new evidence.

■ To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate first that counsel committed specific acts or omissions that "fall outside the wide range of professionally competent counsel and, second, that a reasonable probability exists that but for counsel's error, the result would have been different." *Gardner,* 789 P.2d at 288; *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *State v. Templin,* 805 P.2d 182, 186 (Utah 1990). This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, "a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *see also Templin,* 805 P.2d at 186. In a death penalty case, when an ineffectiveness claim is made on a petition for post-conviction relief with respect to the penalty hearing, the petitioner must be able to show some possibility that but for the error, the sentencer would have imposed a life sentence rather than death. This standard is necessitated by the extremely sensitive nature of the issue before the sentencer and the inexact and somewhat

subjective nature of the considerations that must guide the sentencer. *See State v. Wood,* 648 P.2d 71, 77–82 (Utah 1981); *see also State v. Holland,* 876 P.2d 357, 359–61 (Utah 1994); *State v. Holland,* 777 P.2d 1019 (Utah 1989).

Nevertheless, it was Gardner's burden, in the habeas proceeding, to adduce what favorable evidence could have been presented in his behalf if Dr. Heinbecker had been given more time to prepare. At the penalty hearing, Dr. Heinbecker presented evidence that Gardner suffered from organic brain damage and that, coupled with other mitigating circumstances, explained Gardner's antisocial behavior. Prior to the penalty hearing, Dr. Heinbecker interviewed Gardner for one hour, Gardner's mother for one hour, and Gardner's brother for one and a half hours. Dr. Heinbecker did not administer any psychological tests to Gardner, but he reviewed a number of psychological and medical records relating to Gardner's mental status from the Utah State Hospital and other institutions, beginning when Gardner was about two years old through 1980. A psychiatric report completed after the courthouse shooting in 1985 was also available to Dr. Heinbecker.

Based on his own interviews and the psychological records he reviewed, Dr. Heinbecker testified that Gardner suffered from organic brain damage. Gardner had contracted meningitis at the age of four and had sniffed glue and gasoline from age nine until after age thirteen. Both meningitis and glue sniffing can cause brain damage. Psychological tests performed on Gardner at the Utah State Hospital in 1972, according to Dr. Heinbecker, suggested the possibility of some brain damage. Although Gardner's overall I.Q. was 88, which falls in the dull-normal range, he had comparatively high scores on parts of the test and low scores on other parts, which suggested a degree of organic brain damage. The test was administered by an evaluator from the Utah State Hospital, who concluded that "his practical reasoning ability is in the average or above average range; whereas, his impaired ability to deal with and reproduce written symbols

seriously hinders his chance to profit from the usual academic learning situation."

In addition, Dr. Heinbecker explained Gardner's behavior in terms of three other facts. Dr. Heinbecker testified that Gardner grew up in an unstable and impoverished environment. Indeed, Gardner had been institutionalized for most of his life, beginning at age eight and continuing into adulthood, with the result that Gardner absorbed the moral values of others involved in antisocial criminal conduct. Dr. Heinbecker also testified that Gardner suffered from an antisocial personality disorder that might be explained genetically. Gardner's grandfather, brother, sister, nephew, three cousins, and two half-siblings had all been involved in juvenile court proceedings and/or spent time in prison. Finally, Dr. Heinbecker suggested that Gardner's problems stemmed from parental neglect and inadequate parenting.

On cross-examination in the penalty hearing, the prosecutor did not challenge Dr. Heinbecker's opinions with respect to Gardner's institutional and family background or the personality disorder but confined his questions to the statements that Gardner suffered from organic brain damage. On redirect examination, defense counsel elicited the following information:

Q. You indicated that the only way that you can find organic brain damage is to test. What test was that?

A. Well, the Bender–Gestalt is one of the tests. There are a number of tests that could be used to learn about organic damage, and the Bender–Gestalt is certainly not the best one, but it is the only one that I could find that was used in these tests.

The prosecution presented a psychological evaluation made by Dr. John Gill, a clinical psychologist, who stated, based at least in part on the results of a Bender–Gestalt test, that his "findings are not indicative of blatant organic impairment." Dr. Heinbecker had not previously seen a copy of the report but testified, "What this suggests to me is that he may have had some questions about it." Defense counsel then asked Dr. Heinbecker what Dr. Gill's statement meant, to which he replied, "Well, you know, when he says it is

not indicative of blatant organic impairment, it sounds to me like he is hedging his bets on whether there is organic impairment or not. In other words, he is saying, to me, more sophisticated testing ought to be done."

In the evidentiary hearing in the Rule 65B proceeding, Gardner was given an opportunity to demonstrate exactly how the short preparation time given Dr. Heinbecker impaired his ability to present evidence favorable to Gardner. Dr. Heinbecker was asked if the four hours he spent interviewing Gardner and his family were enough for him to make a complete diagnosis. Dr. Heinbecker stated only that he would have expected to have more time in a case of this magnitude. He did not indicate that any more information could have been developed that would have favored Gardner if he had had more time to prepare. He did not testify that had he administered tests such as the Bender–Gestalt, the Halstead–Rectar, or the Lowery Nebraska, how such additional information would have affected any aspect of Dr. Heinbecker's assessment of Gardner's relevant judgment, reasoning, or behavior, even if they specified more precisely the degree of brain damage. Dr. Heinbecker stated only that it would have been helpful in formulating his diagnosis if Gardner had performed a psychological pen and paper test. Gardner's attorney then, by a leading question, suggested that "if there had been more time, there are many things that you would have done that would have helped you in diagnosis." Dr. Heinbecker merely responded that he "would have liked to have planned the evaluation more carefully." He proved no prospect of any other information of mitigating evidence.

In light of Dr. Heinbecker's testimony, both at the penalty hearing and at the evidentiary hearing below, we do not believe that Gardner was prejudiced by the initial trial court's failure to give Dr. Heinbecker more time or by defense counsels' failure to provide more time to Dr. Heinbecker to prepare. In short, the district court erred in determining that Gardner was denied the effective assistance of counsel in the penalty phase.

## 2. Ineffective Assistance of Counsel on Appeal

■■■■ Gardner argues that he did not have the effective assistance of counsel on the appeal from his conviction and sentence because attorney Ed Brass had a conflict of interest arising from his representation of Gardner and his earlier representation of Carma Hainsworth, the woman who handed Gardner the gun in the courthouse. In addition, Gardner asserts that Brass was ineffective because he did not independently review the trial record to ensure that all appealable issues were adequately addressed in the supplemental brief he filed in the first appeal and because LDA failed to completely withdraw as counsel when ordered to do so by this Court.

The district court ruled (1) that Brass's representation of Carma Hainsworth did not create a conflict of interest with Brass's representation of Gardner on appeal, and (2) that Brass did not provide effective representation because he did not act as an independent counsel.

When Gardner asserted his claim of ineffectiveness of trial counsel to this Court on the first appeal just prior to oral argument, this Court appointed Brass to replace LDA as Gardner's appellate attorney.

The trial court on the habeas petition found that although this Court directed Brass to brief all issues not previously addressed by LDA, he addressed only the single issue of ineffective assistance of counsel because Chief Justice Hall had informed him in a telephone conversation that the scope of his appointment was so limited. The district court also found that the LDA trial attorneys, after being discharged as counsel, prepared and filed supplemental petitions for rehearing that were signed by Brass. The trial court concluded that there was a question as to whether the issues raised on appeal were properly addressed by Brass. The trial court ordered a new appeal to this Court so that Gardner would have the opportunity to appeal all issues based on habeas counsel's own investigation and research.

On this appeal, Gardner challenges the district court's ruling that Brass did not have

a conflict of interest because of his representation of Hainsworth. Gardner also argues that the district court correctly ruled that Brass did not provide independent appellate representation for him and that a new appeal is therefore required. Gardner asserts that an actual conflict of interest existed and that he is not required to show prejudice under *Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984).

*Strickland* imposed a presumption of prejudice when defense counsel labors under an actual conflict of interest, because an attorney's duty of loyalty is "the most basic of counsel's duties." *Id.* at 692, 104 S.Ct. at 2067; *State v. Holland*, 876 P.2d 357, 359 (Utah 1994); *State v. Brown*, 853 P.2d 851, 857–58 (Utah 1992). Prejudice is presumed in the case of a conflict of interest "if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348–50, 100 S.Ct. 1708, 1718–19, 64 L.Ed.2d 333 (1980)).

Brass's prior representation of Hainsworth did not give rise to a conflict of interest. The charges against Hainsworth were resolved separately from the charges against Gardner, and by the time Brass was appointed to represent Gardner, the charges against Hainsworth were concluded, and a conflict, potential or otherwise, no longer existed between the two defendants. The district court correctly rejected Gardner's claim.

With respect to Brass's effectiveness on appeal, the district court misapprehended the law and the facts. The evidence is that Gardner requested that LDA withdraw as appellate counsel only a few days *before* oral argument but *after* all briefing in the case had been completed. This Court's file confirms that LDA filed a motion to withdraw, accompanied by a motion to stay proceedings, three days before oral argument. That motion was argued immediately prior to the oral argument on the merits of the appeal, and the motion was denied. The Court did, however, allow Gardner to supplement the arguments of LDA with arguments of other

counsel and to supplement within thirty days the LDA brief with matters not already addressed. Approximately one month after oral argument, Gardner filed a pro se motion to remove LDA as his counsel of record. That motion was granted, and this Court appointed Brass "counsel for the purpose of assisting defendant in the filing of a supplemental brief which shall address only matters not previously addressed."

Although the order appointing Brass allowed him to present any issue not already addressed, Brass confined his arguments to Gardner's ineffective assistance of counsel claims on the ground that Chief Justice Hall told him that was all he was required to do. The district court apparently believed that this resulted in the failure to raise some appealable issues. However, neither the district court nor Gardner on this appeal has pointed out any meritorious issues that could have been, but were not, raised on direct appeal by either LDA or Brass.

The district court also relied on the fact that LDA prepared appellate papers subsequent to LDA's discharge. After this Court's opinion was handed down, an LDA attorney prepared a supplemental petition for rehearing and a supplemental reply to the State's response to the petition for rehearing that were signed and filed by Brass after he reviewed, approved, and signed the documents. Neither Gardner nor the district court suggests any deficiencies in those documents or refers to any issues that should have been raised.

In short, habeas counsel has apprised us of no issues that should have been raised on the first appeal, and we are aware of none. Although we certainly do not condone either LDA's preparation of documents in connection with the petition for rehearing after LDA was discharged or Brass's signing them, no prejudice flowed therefrom.

## V. CONFLICT OF INTERESTS WITH TRIAL COUNSEL

Gardner asserts that Andrew and James Valdez should have disqualified themselves from representing Gardner because they were witnesses to Gardner's condition

after the courthouse shooting. The district court ruled that the Utah Rules of Professional Conduct and the Code of Professional Conduct previously in effect prohibited the Valdez brothers from representing Gardner but that Gardner had waived any "conflict of interest." Gardner challenges the court's finding that he waived the conflict of interest.

At the time of the events in question here, the Revised Rules of Professional Conduct of the Utah State Bar governed the conduct of Utah attorneys.[3] Disciplinary Rule 5–102(A) provided:

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4).[4]

" '[A]pplication of this rule does not depend on whether an attorney will be called but rather, as the Code provides, on whether he "ought to be called as a witness" in the underlying action.' " *State v. Leonard,* 707 P.2d 650, 653 (Utah 1985) (quoting *Groper v. Taff,* 717 F.2d 1415, 1418 (D.C.Cir.1983) (per curiam)).

The thrust of Gardner's defense was that he was confused at the time of the shootings and did not intend to kill Burdell and that his demeanor after the shooting was therefore relevant to his defense. The Valdez brothers testified in the habeas proceeding that their testimony would have added nothing to Gardner's defense. Andrew Valdez testified that Gardner responded coherently to his questions on the courthouse lawn and that this might have cut against the defense theory that Gardner was confused at the time of the shooting. James Valdez testified that he had nothing to add concerning Gardner's state of mind at the time of the shooting. Gardner argues that this assertion by James Valdez is belied by the fact that he attempted to introduce facts about Gardner's conduct at the scene, well after both shootings, during the cross-examination of a prosecution witness. The only fact that James Valdez tried to bring out was that Gardner grimaced with pain while sitting on the courthouse lawn. That fact, while marginally relevant, adds nothing to establishing that Gardner was confused or incoherent when he shot Burdell. Although the Valdez brothers were "potential" witnesses, they were not material witnesses, and nothing in the record indicates that they *ought* to have been called as witnesses. It is true that to the extent their observations were contrary to Gardner's theory of his defense, they might have been called by the State, but they were not. Whatever the ethical propriety of the conduct of defense counsel, no harm accrued to Gardner.

Gardner also asserts that defense counsel had a conflict of interest because they knew Nick Kirk, whom Gardner had shot during his escape attempt, and other witnesses, and because Gardner and his attorneys had an acrimonious relationship. That is not the basis for a conflict of interest.

Although there was animosity between Gardner and Andrew Valdez, Gardner does not explain how this adversely affected counsels' performance. He asserts that he was extremely unhappy about his confinement conditions and upset with Mr. Valdez because he did nothing to help the situation and that in an effort to change those conditions, Gardner attempted to plead guilty at a pretrial hearing, but his attorneys convinced

---

**3.** The Utah Rules of Professional Conduct became effective on January 1, 1988, and currently govern attorney conduct in Utah.

**4.** None of the exceptions in DR 5–101(B)(1) through (4) applies here.

Rule 3.7 of the Rules of Professional Conduct currently proscribes a lawyer's responsibility when he or she may be called as a witness. That rule states:

> (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
>> (1) The testimony relates to an uncontested issue;
>> (2) The testimony relates to the nature and value of legal services rendered in the case; or
>> (3) Disqualification of the lawyer would work substantial hardship on the client.

him not to. These facts do not reflect adversely on counsels' performance. The fact that a defendant does not get along with his attorney does not, standing alone, establish a denial of the effective assistance of counsel. Gardner must also establish that the animosity resulted in such a deterioration of the attorney-client relationship that the right to the effective assistance of counsel was imperiled. He has not done so.

## VI. RIGHT TO STATE–APPOINTED INVESTIGATORS AND EXPERT WITNESSES IN A COLLATERAL ATTACK ON A DEATH PENALTY

■ A month after filing his petition for post-conviction relief, Gardner requested that expert witnesses and an investigator be appointed at state expense to assist him in prosecuting his petition. Gardner challenges the denial of that request on the ground that it denied him the right to the effective assistance of counsel, due process, meaningful access to the courts, and equal protection under the law. Gardner asserts that the requested assistance was essential to demonstrate that trial counsel provided ineffective assistance by not giving Dr. Heinbecker time to evaluate Gardner more fully and to prepare his testimony.

Utah Code Ann. § 77–32–3 provides for the assignment of counsel at state expense only during the trial proceedings and the first appeal of right or other remedies before or after conviction that the attorney considers to be in the interest of justice. Subsection (2) of § 77–32–3 excludes from the duties of assigned counsel the taking of subsequent discretionary appeals or discretionary writ proceedings:

An assigned counsel shall not have the duty or power under this section to represent an indigent defendant in any discretionary appeal or action for a discretionary writ, other than in a meaningful first appeal of right to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the appellate process of this state.

Clearly, if a defendant is not entitled to appointed, state-compensated counsel under that statute in a habeas proceeding, he is not entitled to state-compensated experts and investigators absent a specific statutory provision granting that right. No Utah statute grants a defendant such a right.

■ Furthermore, *Pennsylvania v. Finley*, 481 U.S. 551, 555–56, 107 S.Ct. 1990, 1993–94, 95 L.Ed.2d 539 (1987), held that a state is not required by due process or equal protection guarantees of access to the courts to provide counsel for indigent prisoners seeking state post-conviction relief. The Court reiterated that position in *Murray v. Giarratano*, 492 U.S. 1, 10, 109 S.Ct. 2765, 2770–71, 106 L.Ed.2d 1 (1989), with respect to death row inmates. It follows that the denial of state-compensated expert witnesses and investigators in a collateral attack on a conviction does not violate a defendant's federal right to due process, access to the courts, or equal protection.

■ Nevertheless, there may be extraordinary cases in which a petitioner for habeas corpus might be entitled under the Utah Constitution to state-compensated counsel, expert witnesses, or investigators.[5]

Gardner has not shown that he could not adequately pursue his habeas claims without appointed investigators and expert witnesses. Although he could not afford to have an evaluation that would establish with greater

---

5. Utah Code Ann. § 77–32–3(3) provides a statutory right, in certain circumstances, for compensation for assigned counsel in a habeas proceeding:

An assigned counsel for an indigent defendant shall be entitled to compensation upon the approval of the district court where the original trial was held, upon a showing that the defendant has been denied a constitutional right or that there was newly discovered evidence that would show the defendant's innocence and that the legal services rendered by counsel were other than that required under this act or under a separate fee arrangement and were necessary for the indigent defendant and not for the purpose of delaying the judgment of the original trier of fact.

Thus, if a conviction rests on the denial of a constitutional right or newly discovered evidence that would show the defendant's innocence, an attorney for an indigent defendant is entitled to compensation, even in a post-conviction proceeding.

certitude the exact nature of his organic brain syndrome, Dr. Heinbecker's testimony failed to show any possibility that further testing would have shown any mitigating facts. As noted, Dr. Heinbecker's testimony indicated nothing of significance that he would have done differently if he had been given more time to prepare.

We have reviewed the rest of Gardner's claims and find them to be without merit.

Gardner is not entitled to a new penalty hearing or appeal. We vacate the trial court's judgment and remand for entry of a judgment consistent with this opinion.

HOWE, J., concurs.

ZIMMERMAN, C.J., and DURHAM, J., concur in the result.

HALL, J., heard oral arguments but retired before he could vote on the case.