FILED
United States Court of Appeals
Tenth Circuit

June 19, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RONNIE LEE GARDNER,

        Petitioner-Appellant,

v.

HANK GALETKA, Warden of the
Utah State Prison,

        Respondent-Appellee.

No. 07-4104

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:95-CV-846-TC)**

Andrew Parnes and W. Keith Goody, Attorneys for Petitioner-Appellant.

Thomas B. Brunker, Assistant Attorney General (Erin Riley, Assistant Attorney
General, and Mark Shurtleff, Utah Attorney General with him on the briefs), Salt
Lake City, Utah, for Respondent-Appellee.

Before **McCONNELL**, **TYMKOVICH** and **GORSUCH**, Circuit Judges.

**McCONNELL**, Circuit Judge.

      While Petitioner-Appellant Ronnie Lee Gardner was being escorted from
prison to the state district court in Salt Lake City in 1985 for a hearing on a charge
of second degree murder, an accomplice handed him a gun.  At point-blank range,

Mr. Gardner shot Michael Burdell, an attorney standing inside the court's archives room. Mr. Burdell died, and Mr. Gardner was convicted of first degree capital murder and sentenced to death.

## I. BACKGROUND

Our recitation of the facts and lengthy case history is based largely on United State Magistrate Judge Samuel Alba's thorough Report and Recommendation, which was adopted with only slight modifications by the Utah District Court in *Gardner v. Galetka*, No. 2:95-CV-846-TC, 2007 U.S. Dist. LEXIS 25643 (D. Utah Apr. 5, 2007); *see also State v. Gardner*, 789 P.2d 273 (Utah 1989) (*Gardner I*) (summarizing the facts of this case).

### A. The Crime

On April 2, 1985, guards transported Mr. Gardner from the maximum security unit of the Utah State Prison to the Metropolitan Hall of Justice in Salt Lake City to appear at a hearing on a second degree murder charge. As he entered the basement lobby of the courthouse, a female accomplice handed him a gun. Mr. Gardner pointed the gun at his guards, who quickly retreated to the parking lot. During this encounter, he exchanged gunfire with one of the guards and was shot, apparently in the chest.

Looking for a way out of the building, a wounded Mr. Gardner entered the archives room. A court clerk, a prison officer, and three attorneys were inside. Mr. Gardner said he had been shot, then walked back out of the archives room.

-2-

When Mr. Gardner went back into the lobby, two of the attorneys, Michael Burdell and Robert Macri, attempted to hide behind the open door to the archives room. Mr. Gardner reentered the archives room with his gun held in front of him. He saw the two attorneys hiding behind the door and stopped in front of them. Standing about one-and-a-half to two feet in front of Mr. Macri, Mr. Gardner tightened his grip on the gun and pointed it at him. Mr. Burdell said, "Oh, my God." Mr. Gardner said, "Oh Fu–" and then moved the gun away from Mr. Macri to Mr. Burdell. Mr. Macri fled out into the lobby and Mr. Gardner fatally shot Mr. Burdell in the head after what one witness described as a "definite pause." Vol. XLVII, State Ct. Tr. 942. Mr. Gardner then fired at Mr. Burdell a second time.

Mr. Gardner forced the prison officer in the archives room to accompany him out to a stairwell leading to the second floor. While Mr. Gardner crossed the lobby, a uniformed bailiff, Nick Kirk, came down the stairs to investigate the commotion. Mr. Gardner shot and seriously wounded Mr. Kirk and then proceeded up the stairs. On the next floor, Mr. Gardner forced a vending machine serviceman to accompany him outside of the building. As soon as Mr. Gardner was outside, the serviceman broke free and dived through a teller's window inside the building. In the parking lot and surrounded by police, Mr. Gardner threw down his gun and surrendered.

**B.     Trial Proceedings and Direct Appeal**

In 1985, Mr. Gardner was tried before a jury in the Third Judicial District Court in Salt Lake County, Utah. The jury convicted Mr. Gardner of first degree murder, attempted first degree murder, aggravated kidnaping, escape, and possession of a dangerous weapon by an incarcerated person. Only the first of these convictions is now at issue. The sole theory of the defense as to this charge was that he lacked the intent to kill Mr. Burdell–that the killing was either an accident, or at most, done with reckless disregard to human life.

On direct appeal, Mr. Gardner made the following claims of error: (1) the district court judge abused his discretion in denying him a change of venue, (2) the judge should have recused himself, (3) the death penalty laws in Utah are unconstitutional, (4) the use of his prior felony as an aggravating circumstance violated his due process rights, (5) he was improperly denied a challenge for cause, (6) excessive security in the courtroom denied his right to a fair trial, (7) the judge violated his Sixth Amendment right to confrontation when he cut off his recross-examination of a witness, (8) corrections officer Wayne Jorgensen testified about statements taken in violation of *Miranda* and *Massiah*, (9) the district court gave an erroneous jury instruction on manslaughter, (10) the district court gave an erroneous oral instruction to the jury regarding the order it should consider the various offenses, (11) the district court improperly denied his motion for directed verdict, (12) the district court erred in admitting evidence of a previous homicide

-4-

he had committed as an aggravating factor, (13) his sentence was disproportionate compared to those given in similar cases, (14) the government engaged in prosecutorial misconduct, and (15) his counsel was ineffective in failing to object to the testimony of Officer Jorgensen, Dr. Heinbecker, and Mr. Fuchs. The Utah Supreme Court denied relief on all claims, *Gardner I*, 789 P.2d at 276, and the United States Supreme Court denied Mr. Gardner's petition for a writ of certiorari. 494 U.S. 1090 (1990).

## C.    State Post-Conviction Proceedings

Mr. Gardner then sought post-conviction relief in state court. The Utah district court addressed all of his claims on the merits, and ruled that Mr. Gardner had been denied effective assistance of counsel both during the penalty phase and on appeal. *Gardner v. Holden*, 888 P.2d 608, 617, 619 (Utah 1994) (*Gardner II*). According to the court, trial counsel did not give a defense psychiatrist enough time to test and evaluate Mr. Gardner, and appellate counsel did not act as independent counsel and failed to adequately research and brief issues on appeal. *Id.* at 619, 620. The court held that these deficiencies required a new penalty hearing and a new appeal. It rejected Mr. Gardner's other claims. Both parties appealed.

The Utah Supreme Court reversed the district court's holding that Mr. Gardner received ineffective assistance of counsel, and affirmed its rejection of

Mr. Gardner's other claims. *Gardner II*, 888 P.2d 608. First, the court rejected

six claims that could have been raised on direct appeal but were not:

> (1) error by the trial court in admitting hypnotically enhanced
> testimony; (2) error by the trial court in not advising Gardner of his
> right to remain silent and not testify; (3) violation of Gardner's right
> to be present at all the hearings in his case; (4) consideration by the
> jury of impermissible information about the victim; (5) failure to
> instruct the jury on all the statutory mitigating circumstances in the
> penalty phase; and (6) failure to instruct the jury in the penalty phase
> that the existence of aggravating factors had to be found beyond a
> reasonable doubt before they could be considered in deciding to
> impose the death penalty.

*Id.* at 614.

The court summarily rejected four of Mr. Gardner's claims of

ineffective assistance during the guilt phase. First, the court held that Mr.

Gardner's claim that counsel were ineffective because he was coerced to

testify was addressed, in essence, on direct appeal when the court rejected

Mr. Gardner's assertion that admitting his prior inconsistent statements

violated his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). *Id.* at

615. Second, Mr. Gardner's claim that his counsel were ineffective because

they elicited testimony from him about his past convictions of violent

crimes was disposed of when the court held on direct appeal that it was error

to admit the evidence of his other violent crimes but not prejudicial. *Id.* at

616. Third, Mr. Gardner's claim that counsel were ineffective in failing to

request a bifurcated trial was essentially the same as the claim raised and

-6-

addressed on direct appeal: whether it was error not to hold a bifurcated hearing. *Id.* Finally, the court held that Mr. Gardner's claim that trial counsel were ineffective because they failed to clarify for the jury that Mr. Gardner was shot in the chest and lung rather than in the shoulder was frivolous. *Id.*

The Utah Supreme Court addressed Mr. Gardner's remaining claims on the merits. The court reversed the district court's holding as to ineffective assistance of trial counsel at the penalty phase, holding that Mr. Gardner was not prejudiced by counsel's failure to give Dr. Heinbecker, a defense psychologist, enough time to prepare before the penalty phase. *Id.* at 619. While the district court ruled that trial counsel had a conflict of interest but that Mr. Gardner waived his right to raise any such conflict, the Utah Supreme Court held that he was not denied effective assistance on account of any conflicts of interest with his trial attorneys. *Id.* at 620–621**.** The Utah Supreme Court also reversed the district court's holding that appellate counsel had failed to research and investigate the trial record for appealable issues, concluding that "habeas counsel . . . apprised [the court] of no issues that should have been raised on the first appeal." *Id.* at 620. The court held that it did not condone appellate counsel's preparation techniques, but no prejudice resulted therefrom. *Id.* The court affirmed the district court's holding that Mr. Gardner's appellate counsel lacked any conflicts of interest in representing him. The court also rejected Mr. Gardner's claim that the trial court's failure to appoint

expert witnesses and an investigator at the state's expense violated his right to effective assistance of counsel, due process, meaningful access to the courts, and equal protection. *Id.* at 622–23.

Again, the United States Supreme Court denied review. 516 U.S. 828 (1995). Ten years had passed since Mr. Gardner's crime and conviction.

**D.     Federal Habeas Proceedings**

In 1997, Mr. Gardner filed a petition for writ of habeas corpus in the United States District Court for the District of Utah. Two years after filing his habeas petition, Mr. Gardner sought to amend his petition to raise a new ineffective assistance claim based on appellate counsel's failure to object to the jury instruction that defined the meaning of the term "knowingly." As discussed below, this instruction was incorrect because it addressed elements of the definition in the disjunctive rather than the conjunctive. This claim had not been raised in state court on direct appeal or during the state post-conviction proceedings. The district court allowed Mr. Gardner to amend his petition, but held the added claim in abeyance until he had exhausted state avenues for relief on the claim. Accordingly, Mr. Gardner filed a second petition for post-conviction relief in state court.

While the jury instruction claim proceeded in state court, in 2003 the magistrate judge issued a report and recommendation addressing and rejecting Mr. Gardner's other habeas claims. The district court adopted the recommendation

-8-

with slight modifications. The court rejected all of Mr. Gardner's ineffective assistance claims on various grounds. The court did not address the deficiency prong of Mr. Gardner's ineffective assistance claims based on his counsel's failure to object to Officer Jorgensen's testimony and failure to fully prepare and present mental health evidence at the guilt phase, instead holding there was no prejudice. The court held that Mr. Gardner failed to establish that his trial counsel had a conflict of interest. Moreover, it was not unreasonable for counsel to have Mr. Gardner testify at the guilt phase, nor was it unreasonable for counsel to rely on Mr. Barton's examination of the gun. Finally, the court rejected as unsupported Mr. Gardner's claims of ineffective assistance for stipulating to his prior convictions and failing to request a bifurcated proceeding.

As to his counsel's performance at the penalty phase, the court held that they acted deficiently in failing to prepare and present mental health evidence, but that no prejudice resulted. The court also rejected Mr. Gardner's ineffective appellate counsel claim, finding that there was no conflict of interest and that none of the issues they failed to raise were meritorious.

The court then addressed Mr. Gardner's remaining claims. The court held that Mr. Gardner failed to establish prejudice resulting from the judge's denial of his motion to change venue, the admission of Mr. Macri's post-hypnosis testimony, or the decision not to bifurcate the trial. The court also rejected Mr. Gardner's claims concerning judicial recusal, excessive security, prosecutorial

misconduct, limitation of cross-examination, notification of the right not to testify, a lesser included offense instruction, exclusion of mitigating evidence during the penalty phase, a jury instruction about mitigating circumstances and aggravation proof, the alleged presumption of death, and the alleged failure to narrow the class of people eligible for the death penalty.

Back in state court, the Utah district court held that Mr. Gardner's belated claim of appellate ineffectiveness based on the faulty jury instruction was procedurally barred. The Utah Supreme Court affirmed. *Gardner v. Galetka*, 94 P.3d 263 (Utah 2004) (*Gardner III*). On return to federal court, the district court disagreed, holding that the claim was not procedurally barred; however, the court denied this claim for lack of prejudice. *Gardner*, 2007 U.S. Dist. LEXIS 25651, at *30-31. Mr. Gardner timely appealed both the order rejecting his claim of appellate ineffectiveness based on the faulty jury instruction and the order rejecting all other claims. At this point, twenty-two years had passed since his 1985 crime and conviction.

## II. DISCUSSION

Since Congress's 1986 revision of the standards applicable to federal habeas review of state court convictions, the Anti-terrorism and Effective Death Penalty Act ("AEDPA"), the role of the federal courts has become that of a back-stop or safety net to ensure that state courts applied the constitutional standards in effect at the time (as enunciated by the Supreme Court) and did so reasonably. Habeas

-10-

review is no longer an occasion for refinement or modification of constitutional principles or for federal court second-guessing of state court application of constitutional law, so long as the state court addressed the merits of any properly presented federal constitutional claim, applied correct standards, and reached a decision that is within the zone of reasonableness. Under this statutory framework, a state prisoner seeking federal habeas review is entitled to relief only if he can demonstrate that the state adjudication on the merits "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2). Unless otherwise stated below, we review Mr. Gardner's claims under this standard of review. Our review of decisions by the federal district court on questions of law is de novo; our review of factual findings, if any, is for clear error. *United States v. Sims*, 428 F.3d 945, 960 (10th Cir. 2005).

## A. Ineffective Assistance at Guilt Phase

Mr. Gardner's sole defense at the guilt phase was that he lacked the intent to kill Mr. Burdell. He argued that the killing was either an accident, or at most, done with reckless disregard to human life. He now contends that his counsel was unconstitutionally deficient in four areas in making this argument at trial.

-11-

**1.    Failure to Adequately Investigate Mr. Gardner's Mental Health**

Prior to the guilt phase of the trial, defense counsel engaged a psychologist, Dr. Rindflesh, to examine Mr. Gardner.  The examination took an hour and a half. *See* Mag. Rep. 63.  Dr. Rindflesh's subsequent report indicated that there were no signs of a major psychological disorder now or in the past, suggesting further investigation would be fruitless.  *Id.* at 73.  *But see id.* at 74 (noting that Dr. Rindflesh wrote in his report, "Perhaps an interview in a more open setting will be possible in the future," suggesting that another examination might have been preferable).  Mr. Gardner argues that trial counsel failed to undertake a sufficient investigation of his mental health issues to support his lack of intent defense.

In his state post-conviction petition, Mr. Gardner argued that his counsel failed to adequately investigate and present evidence that he had been shot in the chest rather than in the shoulder, and to present evidence of the wound's potential effect on his mental state.  *Gardner II*, 888 P.2d at 616.  The court rejected this claim as frivolous.  *Id.*  In his federal habeas petition, Mr. Gardner argued that his counsel was ineffective for inadequately investigating both ballistics and mental health evidence in preparation for the guilt phase.  The magistrate judge rejected his argument, finding that defense counsel's reliance on Mr. Barton's examination of the gun was not deficient, and even if counsel's failure to investigate Mr. Gardner's mental health more fully was deficient, it was not prejudicial.  Mr. Gardner objected to the magistrate judge's finding that his counsel at the guilt

-12-

phase adequately investigated the defense that Mr. Gardner did not intend to kill Mr. Burdell. This objection to the magistrate judge's report, however, focused solely on his counsel's failure to adequately investigate the murder weapon. Thus, Mr. Gardner did not object to his counsel's failure to investigate his mental health in preparation for the guilt phase. Because Mr. Gardner failed to make this objection to the magistrate judge's report, this claim has been waived and will not be considered. *See Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (applying the firm waiver rule).

Even if Mr. Gardner had properly raised this issue in district court, we would conclude that his counsel was not constitutionally deficient. After all, a psychologist did evaluate Mr. Gardner, albeit for a short time, and his report indicated that he suffered from no major psychiatric disorder. Mag. Rep. 73; *see Bell v. Thompson*, 545 U.S. 794, 809–10 (2005) (stating it would be an "uphill battle" for a defendant to show the need for further mental health investigation when two experts had concluded he was not mentally ill); *Wilson v. Sirmons*, 536 F.3d 1064, 1089 (10th Cir. 2008) ("[I]n many situations, the expert will know better than counsel what evidence is pertinent to mental health diagnoses and will be more equipped to determine what avenues of investigation are likely to result in fruitful information"). Nothing in Dr. Rindflesh's report indicated that further evaluation would result in evidence supporting Mr. Gardner's insanity defense. While Dr. Rindflesh suggested the possibility of "an interview in a more open

-13-

setting" sometime in the future, he indicated that any additional interviews would help him better understand only Mr. Gardner's impulsiveness and ability to feel remorse, neither of which would shed light on whether Mr. Gardner understood what he was doing when he shot Mr. Burdell. Under these circumstances, we cannot regard counsel's failure to pursue this course as so "completely unreasonable," *Wilson*, 536 F.3d at 1083, as to be constitutionally deficient. After all, there were substantial strategic reasons not to pursue this line of defense before the jury: it would have opened the door to damaging evidence regarding the violent acts he engaged in during prior offenses while uncontestedly in control of his faculties. This suggests that defense counsel made an objectively reasonable strategic decision in not investigating further or presenting psychological evidence at trial.

Moreover, even if defense counsel were deficient in not having a more elaborate evaluation conducted, no prejudice resulted from his failure to investigate further. A psychologist who later examined Mr. Gardner, Dr. Heinbecker, testified that Mr. Gardner's psychological state might lead him to act on "automatic pilot" during stressful situations. Mag. Rep. 69. Such testimony might support an irresistible impulse defense, but Utah does not recognize such a defense. *See State v. Herrera*, 993 P.2d 854, 861–62 (Utah 1999) (noting that a mental disorder serves as a defense to a murder only if it prevents a person from

*understanding* that he is killing a human being).  Thus, under these circumstances, defense counsel likely was not deficient, and even if he was, no prejudice resulted.

**2.     Failure to Present Ballistics Evidence**

Mr. Gardner claimed in the state court post-conviction proceedings that his counsel was ineffective for failing to offer evidence that would have cast doubt on whether he had intended to kill Mr. Burdell.  His theory was that at the time he pulled the trigger on Mr. Burdell, he was in shock as a result of having been shot by one of the courthouse guards.  Trial counsel was ineffective, he argued, because counsel implied to the jury that Mr. Gardner had been shot in the shoulder, when in fact he suffered much more serious wounds to his chest and lungs.  Mr. Gardener contended that an accurate account of his injuries would have better shown the jury the shock that he was experiencing, and that this would have a bearing on his *mens rea*.  The Utah Supreme Court rejected this claim as frivolous. *Gardner II*, 888 P.2d at 616.

In his federal habeas petition and on appeal, Mr. Gardner similarly argued that trial counsel was ineffective for failing to offer evidence that would have cast doubt on whether he had intended to kill Mr. Burdell, but the basis for that argument has shifted from misdescription of his wound to counsel's failure to undertake a thorough investigation of the murder weapon.  He claims that counsel failed to engage a forensic laboratory to investigate the inner workings of the gun.  A subsequent investigation, in 1999, found that the gun had a faulty safety device.

Mr. Gardner contends that if counsel had properly investigated the weapon at the time, he could have used this evidence to support an inference that the gun went off accidentally, or upon such slight finger pressure that the firing was not intentional.

Contrary to Mr. Gardner's argument, this claim is not substantially the same as the one he raised in state court, but is based on an entirely different factual predicate. The failure to investigate the murder weapon is not the same as the failure to present evidence to the jury regarding the nature of his wounds. Because this claim could have been raised in state court and was not, Mr. Gardner is now procedurally barred from raising it at this late stage. *See Magar v. Parker*, 490 F.3d 816, 818 (10th Cir. 2007) (noting that habeas petitioners seeking relief in federal court must first exhaust all available state court remedies); *Cf. Duffield*, 545 F.3d at 1238 (discussing importance of raising issues in a timely manner to avoid waiver).

Even if we were to hold that this claim was not procedurally barred, Mr. Gardner would still not be entitled to relief. First, defense counsel did not act deficiently. In addition to reviewing the examination of the weapon conducted by the Utah State Crime Laboratory, Mr. Gardner's lawyers had the gun examined by Edward Barton, a defense investigator with ballistics expertise. He concluded that it took two pounds of pressure to pull the trigger, and reported that this was average for a single action handgun. The gun would "not be classified as having a

hair trigger." He also stated that the hammer had three stop positions, all in good working order. Mr. Gardner does not explain why his counsel acted deficiently in relying on Mr. Barton's investigation. Nothing in Mr. Barton's report suggested that counsel should have had the gun analyzed further.

Moreover, no prejudice resulted from any alleged deficiencies. At trial, the state's expert testified that the gun had to be cocked before it could be fired. The post-trial examination of the gun did not indicate it was faulty in any material way. A ballistics expert testifying in the 1999 federal hearing confirmed that the gun did not have a hair trigger. He indicated that he could not get the gun to fire accidentally through "drop tests." Collectively, this evidence strongly suggests that the gun did not go off accidentally, but rather was intentionally cocked and fired twice at Mr. Burdell. While the 1999 expert testified that the gun had a malfunctioning safety device that could have caused the gun to fire if Mr. Gardner had pulled the trigger and released it before the hammer actually fell, Mr. Gardner has put forth no evidence to show that he tried to release the trigger after pulling it. In other words, even if defense counsel had consulted another investigator before trial, the elicited information would not have materially assisted Mr. Gardner's defense.

**3.    Failure to Object to Officer Jorgensen's Testimony**

Mr. Gardner also contends that trial counsel was ineffective during the guilt phase by failing to object to testimony by Officer Wayne Jorgensen, presented on

rebuttal, regarding incriminating statements Mr. Gardner made to him while in the hospital. According to Officer Jorgensen, he guarded Mr. Gardner while he was in the hospital on two occasions. On the first night, Mr. Gardner initiated a conversation with him and volunteered information about Mr. Burdell's murder. He kept talking until Officer Jorgensen cut him off. On the second occasion, Mr. Gardner again initiated conversation with Officer Jorgensen and they "got talking" about Mr. Burdell's murder. Officer Jorgensen asked if Mr. Gardner would have shot him [i.e., Officer Jorgensen], to which Mr. Gardner responded, "Hell, man, I had to get away, I didn't care who it was," and "Hey, I had to do what I had to do." When Officer Jorgensen asked Mr. Gardner why he shot Mr. Burdell, Mr. Gardner said it was because he thought Mr. Burdell was going to "jump on [him] and stop [him]." Officer Jorgensen filed no incident reports about these statements, and Mr. Gardner later denied ever making them.

Mr. Gardner claims that his counsel should have moved to suppress Mr. Jorgensen's testimony about Mr. Gardner's alleged statements because they were involuntary under *Mincey v. Arizona*, 437 U.S. 385, 398 (1978), unreliable, and elicited in violation of *Miranda* and his Sixth Amendment right to counsel. On direct appeal, the Utah Supreme Court did not address whether trial counsel was deficient for failing to challenge the testimony, but held that no prejudice resulted because there was overwhelming evidence of Mr. Gardner's intent to shoot Mr. Burdell. *Gardner I*, 789 P.2d at 288. We do not regard this conclusion

-18-

as unreasonable, and therefore hold, under AEDPA's deferential standard, that this claim does not warrant federal habeas relief.

The Utah Supreme Court correctly found that there was ample evidence, wholly apart from Officer Jorgensen's testimony, that Mr. Gardner's killing of Mr. Burdell was intentional. Mr. Gardner himself admitted asking for a loaded gun because an unloaded gun was useless; a witness testified that he saw him pause before shooting Mr. Burdell; another witness testified that Mr. Gardner had pointed the gun at him but then turned the gun and shot Mr. Burdell instead; and Mr. Gardner fired at Mr. Burdell twice, which required him to both cock the gun and pull the trigger twice. This overwhelming evidence of guilt would have come in and would have necessitated a finding of intent, even if Officer Jorgensen's statements had been suppressed. Thus, no prejudice resulted.

Even if we were to find that the court acted unreasonably in finding that no prejudice resulted for the alleged deficiencies, defense counsel did not act deficiently in any of the four ways Mr. Gardner suggests. As we discuss below, the statements did not violate *Miranda* or *Massiah*, counsel could not prove the statements were given involuntarily, the statements were reliable, and counsel acted reasonably in calling Mr. Gardner to the stand. In reaching those conclusions, we bear in mind that a reviewing court must be "highly deferential" to counsel's decisions. *Strickland v. Washington*, 466 U.S. 668, 689 (1984). "To prove deficient performance, petitioner must overcome the presumption that

-19-

counsel's conduct was not constitutionally defective." *Wallace v. Ward*, 191 F.3d 1235, 1247 (10th Cir. 1999). "Counsel's performance must be 'completely unreasonable' to be constitutionally ineffective, not 'merely wrong.'" *Wilson*, 536 F.3d at 1083 (quoting *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997)).

### a.     *Miranda* **and** *Massiah* **Violations**

Mr. Gardner claims his counsel acted deficiently in failing to object to Officer Jorgensen's statements on *Miranda* or *Massiah* grounds. Those cases stand for the proposition that the Fifth and Sixth Amendments afford individuals the right to counsel before and after indictment while being questioned by government officials. It is evident that admission of Officer Jorgensen's testimony, on rebuttal, did not violate those principles.

First, it is not clear that Officer Jorgensen initiated the conversations with Mr. Gardner. The officer testified that the two men "got talking," and Mr. Gardner, who is the only other person present at the time, does not testify that Officer Jorgensen initiated the conversation. Instead, Mr. Gardner claims that the conversations did not take place at all. If Mr. Gardner volunteered the information to Officer Jorgensen without any action on the part of the state, there would be no constitutional violation in introducing it into evidence. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (explaining that *Miranda* applies only where questioning is initiated by law enforcement); *see also Pickens v. Gibson,* 206 F.3d 988, 994–95 (10th Cir. 2000) (statements obtained in violation of *Miranda* are admissible

-20-

where defendant re-initiated communication). We are reluctant to rely entirely on this ground, however, because no lower court has reached any factual finding regarding Officer Jorgensen's credibility; Mr. Gardner does not confirm or admit that the officer did not initiate the conversation; and there is evidence in the record that casts doubt on Officer Jorgensen's testimony, including the fact that he filed no incident report at the time.

Quite apart from whether the state initiated the conversations, however, introduction of the testimony could not have violated *Miranda* and *Massiah* because these decisions apply only to the introduction of evidence as part of the prosecution's case in chief and do not prevent statements that are otherwise inadmissible from being admitted to contradict a witness' testimony on rebuttal. *Harris v. New York*, 401 U.S. 222, 225–26 (1971). As the Supreme Court held in *Harris*, *Miranda* and *Massiah* prevent the affirmative use of uncounseled statements but do not license a defendant to perjure himself without threat of refutation using his prior statements. *Id.* at 226; *see also Kansas v. Ventris*, 07-1356, — U.S. —, 2009 U.S. LEXIS 3299, at *14 (2009) (holding that testimony elicited in violation of Sixth Amendment is admissible to impeach). Here, where Mr. Gardner testified that he did not know what was happening when he killed Mr. Burdell, the jury was entitled to learn of his statements to Officer Jorgensen that he "had to get away," that he did "what I had to do," and that he shot Mr. Burdell because he thought Mr. Burdell was going to "jump on [him] and stop [him]." To

-21-

be sure, the jury might have disbelieved Officer Jorgensen's account, but that does not make the testimony inadmissible under *Miranda* and *Massiah*.

Even assuming the statements were admissible on rebuttal, Mr. Gardner argues that his counsel had a duty to request an instruction limiting the use of the testimony to the issue of credibility. On direct appeal, the Utah Supreme Court rejected this argument, stating that the failure to request the instruction was not "manifest error." *Gardner I*, 789 P.2d at 282. Not requesting a limiting instruction could have been a reasonable tactical decision to keep the damaging statement from being reiterated to the jury, and thus not objectively unreasonable.

Accordingly, Mr. Gardner's counsel did not act deficiently in failing to object to Officer Jorgensen's testimony on Fifth and Sixth Amendment grounds.

**b.    Voluntariness**

Mr. Gardner next claims his statements were inadmissible because he was under medication at the time and the statements were therefore not given voluntarily. The Utah Supreme Court did not address this claim, but after conducting an evidentiary hearing the federal district court concluded that it was reasonable for trial counsel not to have raised this objection. At the 1999 federal hearing, a psychiatrist testified that Mr. Gardner was on Halcion, a short term treatment for insomnia, on the night he supposedly made the statements. Mag. Rep. 44. The psychiatrist testified that the drug could cause amnesia, but that there was only a remote chance it caused Mr. Gardner to forget making the

-22-

statement. If the statement had been made while under the influence of Halcion, he would not have been fully awake or conscious of what he was doing, and the combination of Halcion and anti-anxiety medication could have loosened up Mr. Gardner's inhibitions. Another psychiatrist testified that the dose of Halcion administered to Mr. Gardner was very unlikely to have caused amnesia.

We conclude that counsel acted reasonably in concluding the statements to Officer Jorgensen were voluntary. A statement is inadmissible if it is not "the product of a rational intellect and free will." *Mincey*, 437 U.S. at 398. Mr. Gardner's own testimony suggests his mental capacity was not significantly affected by Halcion. He claims to remember the night clearly. He remembers being in the hospital, that Officer Jorgensen was guarding him in the room, and that he did not make the statement. Moreover, Officer Jorgensen testified that Mr. Gardner did not appear to be medicated when he gave the statements. Taken together, the district court concluded that this evidence could have led counsel reasonably to believe that the statement could not be suppressed as involuntary.

There is a significant factual component to that conclusion, which is not plainly erroneous and must therefore guide this court's analysis of the issue. In light of the facts as found by the district court, and bearing in mind the presumption that counsel's performance was not constitutionally defective, we agree with that court that counsel acted reasonably in not raising the voluntariness objection to Officer Jorgensen's testimony.

-23-

### c.     Unreliability

Mr. Gardner argues that, at the very least, Officer Jorgensen's testimony about his alleged statements was so unreliable that his counsel should have objected under Utah Rule of Evidence 403.  Under Rule 403, evidence can be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  This particular objection was not raised in state court, but was raised in his federal habeas petition.  There is no apparent reason why Mr. Gardner could not have raised his Rule 403 argument in state court, so Mr. Gardner is procedurally barred from raising the issue now.  *Magar*, 490 F.3d at 818.

Even if we were to address this issue, however, we would agree with the decision of the magistrate judge and the district court to reject the argument.  As the magistrate judge noted, "Rule 403 is not to be used to exclude testimony that a trial judge does not find credible because credibility questions are the prerogative of a jury."  Mag. Rep. 50.  We defer to the factfinder's credibility determinations, as it is in the best position to evaluate such matters.  *United States v. Barron-Cabrera*, 119 F.3d 1454, 1457 (10th Cir. 1997).  Thus, defense counsel did not act unreasonably in failing to object on Rule 403 grounds.

### 4.     Counsel's Decision to Encourage Mr. Gardner to Testify

Finally, Mr. Gardner contends that trial counsel was ineffective because he encouraged Mr. Gardner to take the stand, which proved injurious to his defense.

-24-

In the state post-conviction proceedings, Mr. Gardner argued that his counsel was ineffective for coercing him to testify. The court dismissed the claim, holding that the issue had been addressed, in essence, on direct appeal when the court rejected Mr. Gardner's assertion that admitting his prior inconsistent statements violated his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). *Gardner II*, 888 P.2d at 615. Mr. Gardner argued in his federal habeas petition that his counsel was ineffective in calling him to testify. The district court disagreed, finding counsel's performance was not deficient. We affirm and hold that counsel's decision on this point was within the reasonable range of effective trial strategy.

The theory of the defense was that Mr. Gardner had planned only to escape, not to kill anyone; once he was shot, he did not know what was going on, and while in a dazed state, saw movement in the archives room and his gun discharged unintentionally. Mr. Gardner argues that his counsel acted unreasonably in calling him to testify because his testimony did not support this theory and that calling him opened the door for Officer Jorgensen's testimony on rebuttal. He also claims that his counsel knew he would say that he could not remember the immediate circumstances surrounding Mr. Burdell's death and that he would refuse to name his accomplice.

After full examination of the record, we agree with the district court that defense counsel did not act unreasonably in calling Mr. Gardner to the stand. Apart from Mr. Gardner's own testimony, the defense had little evidence to

-25-

support its theory. As already discussed, there was little evidence to support a major psychological disorder that could have prevented Mr. Gardner from having the requisite intent, and there was also little evidence suggesting that the gun went off accidentally. Thus, even if Mr. Gardner's own testimony contained a few damaging statements, a reasonable attorney could easily conclude that it was, on balance, the best hope of providing evidence that could support a verdict of acquittal.

**5.     Cumulative Effect**

Though none of these alleged errors itself warrants reversal, we are required to look at the cumulative effect of counsel's errors. *Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002). "A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (citation omitted). The harmlessness inquiry for cumulative error is the same as the inquiry for individual error: were the defendant's substantial rights affected? *Id.* at 1470. We hold that even if any of the claims of ineffective assistance during the guilt phase have merit, the strong evidence of Mr. Gardner's intent to shoot Mr. Burdell would have still convinced the jury of his guilt. Mr. Gardner had an extensive history of violence and had previously attempted to escape from an industrial school and

state prison facilities. No expert testimony supported the argument that Mr. Gardner's mental condition prevented him from understanding his actions and their intended result. No evidence was presented that established the gun was faulty in any material way. In addition, Mr. Gardner shot Mr. Burdell twice and later admitted that he asked for a loaded gun because an unloaded gun would have been useless. All of these facts strongly suggest he had the intent to kill Mr. Burdell. Thus, reversal is not warranted on the cumulative effect of counsel's errors.

**B.     Ineffective Assistance at Penalty Phase**

Mr. Gardner argues that his counsel acted deficiently in failing to adequately investigate and present evidence of Mr. Gardner's social and mental history during the penalty phase. The state district court during post-conviction proceedings addressed a version of this argument, holding that Mr. Gardner was denied effective assistance when his counsel failed to give the defense psychiatrist, Dr. Heinbecker, more time to prepare for the penalty phase. The Utah Supreme Court reversed, holding that Mr. Gardner was not prejudiced by his counsel's failure to give the psychiatrist more time to prepare. *Gardner II*, 888 P.2d at 619. The court noted that Dr. Heinbecker had not indicated that more preparation time would have led to more information favoring Mr. Gardner. *Id.* In federal court, the magistrate judge similarly concluded that counsel was deficient at the penalty phase but that no prejudice resulted. Unlike the magistrate

-27-

judge, the district court did not address the deficiency issue, concluding that there was no prejudice.

## 1.     Standard of Review

Typically we would address the prejudice issue under deferential AEDPA standards because the issue was addressed on the merits by the Utah Supreme Court.  Oddly, however, in oral argument the state asserted, against its interest, that the issue should be reviewed de novo.  Aple. Br. 3.  The state reached this conclusion by applying Utah Code Annotated §§ 78B-9-109 and -202(2), as well as our decision in *Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008).  Section 78B-9-109(1) provides that "the court may, upon the request of an indigent petitioner, appoint counsel on a pro bono basis to represent the petitioner in the post-conviction court or on post-conviction appeal."  In determining whether to appoint counsel, the court is to consider "whether the petition or the appeal contains factual allegations that will require an evidentiary hearing," and "whether the petition involves complicated issues of law or fact that require the assistance of counsel for proper adjudication."  Utah Code Ann. § 78B-9-109(2).  Utah Rule of Criminal Procedure 8(e) sets forth the requirements of counsel appointed in these circumstances.

The state relies on our reasoning in *Wilson* and the rule laid out above in conceding that AEDPA deference does not apply.  We stated in *Wilson* that "when a state court's disposition of a mixed question of law and fact, including a claim of

-28-

ineffective assistance, is based on an incomplete factual record, through no fault of the defendant, and the complete factual record has since been developed and is before this Court, we apply de novo review to our evaluation of the underlying claim." 536 F.3d at 1079. Here, the state assumed that where the defendant did not have the resources to develop a full factual record on this issue, it was "no fault of the defendant" that an incomplete factual record existed at the state court level. As a result, the state argues that we should apply de novo review.

There is a key difference, however, between *Wilson* and this case. In *Wilson*, the prisoner had a federal right to an evidentiary hearing, which was denied by the state court despite his diligence in pursuing the right.[1] Here, however, any right Mr. Gardner may have had to funding to develop a factual record is a product of state law, not federal law. Federal habeas review is confined to denials of federal rights, see 28 U.S.C. § 2254(a), and it is therefore irrelevant at this stage whether or not Mr. Gardner was denied the rights to which

---

[1] Specifically, the prisoner had a right to an evidentiary hearing if he could show that his "allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief." *Wilson*, 536 F.3d at 1081. Under Oklahoma procedure rules, however, a defendant raising an ineffective assistance claim based on non-record evidence has a right to an evidentiary hearing only if he can show by "clear and convincing evidence there is a strong possibility trial counsel was ineffective." *Id.* at 1080. Because the state court denied the prisoner an evidentiary hearing on the latter standard, the *Wilson* court held that he was denied a federal right. That holding is presently under review by the en banc court. *See Wilson v. Sirmons*, 2008 U.S. App. LEXIS 27448 (10th Cir. Dec. 2, 2008). The result of that rehearing proceeding cannot affect this case, however, because whether or not Wilson was denied a federal right, there is no argument that Mr. Gardner was.

he may have been entitled under state law. Our decision in *Wilson* therefore does not have the implications for our standard of review in this case that the state seems to think.

The state's candid (if unwarranted) concession raises a related issue: can the congressionally mandated deferential standard of review be waived by counsel? In other words, should this court apply a standard of review more searching than that dictated by ADEPA on account of the fact that the state's appellate lawyers mistakenly believed that the more searching standard applies?

It is well established that states may waive some of AEDPA's provisions. *See, e.g.*, *Boston v. Weber*, 525 F.3d 622, 626 (8th Cir. 2008) (holding that if a state intelligently chooses to waive a statute of limitations defense in a habeas case, a district court is not at liberty to disregard that choice); *Torres v. Senkowski*, 316 F.3d 147 (2d Cir. 2002) (holding that a state cannot waive AEDPA's requirement that circuit courts rather than district courts must authorize successive habeas motions or applications because the requirement is jurisdictional); *see also* Note, Rewriting the Great Writ: Standards of Review for Habeas Corpus Under the New 28 U.S.C. § 2254, 110 Harv. L. Rev. 1868, 1871 n.26 (1997) (explaining that AEDPA requires "federal courts to find an express waiver of exhaustion [by the state] before taking jurisdiction over an incompletely exhausted state appeal"). This court has apparently never addressed whether the state can waive the standard of review under AEDPA. Other courts of appeal have, however, done so, and all

have concluded that the standard of review under AEDPA cannot be waived by the parties. *Brown v. Smith*, 551 F.3d 424, 428 n.2 (6th Cir. 2008); *Eze v. Senkowski*, 321 F.3d 110, 121 (2d Cir. 2003); *Worth v. Tyler*, 276 F.3d 249, 262 n.4 (7th Cir. 2001).

We agree with our sibling circuits that the correct standard of review under AEDPA is not waivable. It is, unlike exhaustion, an unavoidable legal question we must ask, and answer, in every case. *See Eze*, 321 F.3d at 121 ("AEDPA's standard of review . . . is not a procedural defense, but a standard of general applicability for all petitions filed by state prisoners after the statute's effective date presenting claims that have been adjudicated on the merits by a state court."). Congress set forth the standard in "unequivocally mandatory language." *Id. See* 28 U.S.C. § 2254(d) (instructing that a state prisoner's petition for a writ of habeas corpus "*shall not be granted* with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding") (emphasis added). It is one thing to allow parties to forfeit claims, defenses, or lines of argument; it would be quite another to allow parties to stipulate or bind us to application of an incorrect legal standard, contrary to the

congressional purpose. We therefore will review this claim under AEDPA's deferential standard.

## 2.  Ineffectiveness at Penalty Phase

To determine the appropriateness of the death penalty, "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545 (1987). Thus, in a capital case, defense counsel's duty to investigate "includes investigating petitioner's background" for such mitigating circumstances. *Smith v. Gibson*, 197 F.3d 454, 463 (10th Cir. 1999). In Utah, a jury must find unanimously that the aggravation outweighs the mitigation beyond a reasonable doubt in order to impose the death penalty. Utah Code Ann. § 76-3-207. Reversing the death penalty is appropriate where there is a reasonable likelihood that the sentencing jury would not have sentenced the defendant to death if it had considered the mitigating evidence counsel failed to present. *Williams v. Taylor*, 529 U.S. at 391 (2000); *see, e.g., Wilson v Sirmons,* 536 F.3d 1064 (10th Cir. 2008); *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004).

Prior to trial, defense counsel arranged for a psychiatrist, Dr. Rindflesh, to meet with Mr. Gardner and prepare a report of his mental health. During trial, counsel contacted several other psychologists, none of whom were willing to meet

with Mr. Gardner. Before the penalty phase, defense counsel enlisted the help of Dr. Heinbecker, who was contacted only after the guilty verdict was rendered, just two days before the penalty phase began. Dr. Heinbecker did not review Mr. Gardner's juvenile and institutional records until the day before he testified at the penalty phase. Defense counsel said that Dr. Heinbecker spent most of the day reviewing documents and then met with counsel in the evening. Dr. Heinbecker, who had testified in three other capital cases, stated, I "had never been in a case like this where I wasn't given adequate records . . . or adequate time to review the records." Aplt. Br. 27.

It is undisputed that Mr. Gardner's childhood was troubled in many respects. According to his submission on appeal, if the full, accurate picture of Mr. Gardner's background had been presented at the penalty phase, the jury would not have sentenced him to death. He argues that this evidence would have shown, *inter alia*, the following: he grew up in a dysfunctional family, the product of a broken home; he lived in a condemned house for some time, then lived with various foster families and was in and out of detention facilities; his step-father exposed him to criminal activity; the children in his family were sexually and emotionally abused; he was hospitalized for meningitis as a child, which could have caused organic brain damage; he had been sniffing gasoline since he was six years old, which could have caused brain damage; he was introduced to LSD by age ten; also by age ten he had been charged with public intoxication, shoplifting,

petty larceny, grand larceny, gas sniffing, and violence against fellow students and his sister; at age eleven he spent one year in a locked facility at Utah State Hospital where he was introduced to pot and acid; psychological tests at the State Hospital revealed evidence of possible brain impairment; he scored a forty-seven on the Halstead Reitan Battery of tests, indicating moderate brain damage with possible implications on judgment; he was placed in a state industrial school at age fourteen; he has a tic, which could suggest brain illness; and, he has a history of "being immature, acting on impulse without any internal controls." Aplt. Br. 30.

The Utah Supreme Court, overturning the conclusion of the state district court, held that counsel's failure to give Dr. Heinbecker more time to prepare for trial was insufficiently prejudicial to warrant habeas relief. Petitioner has not suggested that the Utah court failed to apply the proper constitutional standard. Applying AEDPA deference, we hold that the Utah Supreme Court's conclusion was not an "unreasonable application of . . . clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Notwithstanding the abbreviated period he was given to prepare, Dr. Heinbecker did testify to most of the above-summarized background information. He testified that Mr. Gardner had an unstable upbringing, the product of a broken home. His mother had difficulty disciplining her nine kids, his step-father was incarcerated, his family had lengthy criminal and substance abuse histories, and his mother was charged with parental neglect when Mr. Gardner was two and five.

Dr. Heinbecker further testified that Mr. Gardner was in and out of state institutions for most of his life, and tests revealed some evidence of organic brain damage.

The information Dr. Heinbecker could have discovered and presented if given more time would likely only have added color to what Dr. Heinbecker actually did testify to at the penalty phase. Knowing of his difficult upbringing and possible brain damage did not convince a jury to forego the death penalty. It is not likely that further detail about Mr. Gardner's youthful drug use, criminal history, and scores on various mental tests would have changed the outcome. Additional evidence along these lines could even have a double-edged effect, to the extent that it could increase the jury's perception of Mr. Gardner's dangerousness. The greater the dysfunction in his family, the less likely it is that Mr. Gardner's violence would subside if ever released.

Moreover, specific evidence designed to show that Mr. Gardner was not fully in control of his actions could have opened the door to extensive and damaging rebuttal evidence. The jury had not been informed of a number of violent acts Mr. Gardner committed in the past, which appeared to be calculated and controlled. Had the defense presented evidence to show that Mr. Burdell's killing was a product of Mr. Gardner's upbringing, the prosecution probably could have introduced this damaging evidence in rebuttal. The prosecution also could have introduced expert testimony that Mr. Gardner's anti-social personality

disorder would not impair his volition. Indeed, Mr. Gardner's own 1999 experts testified that he performs well under stress and always manages to stop when his life is threatened. In addition, the prosecution could have introduced Mr. Gardner's own statement that one of the motivating factors behind his attempted escape was his desire to return to drug use. Finally, the prosecution could have admitted evidence that his anti-social personality disorder was brought on in large part by his own actions, including extensive drug use.

Reasonable minds may differ on the likely impact on the jury of more thoroughly researched mental health testimony, as the differing assessments of the state judges demonstrates. The question before us, however, is not whether the Utah Supreme Court was correct but whether its judgment was unreasonable. Based on our review of the arguments and record evidence, it was not.

Mr. Gardner tries to compare this case to *Wiggins v. Smith*, 539 U.S. 510 (2003). In *Wiggins*, a 77-year old woman was murdered by being drowned in her bathtub and sprayed with insect killer. The Supreme Court held that defense counsel acted deficiently in not adequately investigating and presenting evidence of the defendant's troubled family and social history at sentencing. Though defense counsel had one psychologist run tests on the defendant and examined his social services records, Mr. Wiggins' attorneys claimed to have made a strategic decision not to investigate further or to present this evidence to the jury. *Id.* at 553 (Scalia, J., dissenting). The Court held this was an insufficient investigation

into possible mitigating circumstances. *Wiggins*, 539 U.S. at 534-35. What defense counsel had found in its limited investigation showed a long history of foster care and abuse, and "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses." *Id.* at 525.

This case, however, differs from *Wiggins* in two key respects. First, in *Wiggins* there was no apparent risk of opening the door to damaging evidence by introducing the potential mitigating circumstances of Mr. Wiggins' difficult childhood. Here, as outlined above, the prosecution could have presented extensive damaging evidence in rebuttal. Thus, it is much more likely in this case than in *Wiggins* that defense counsel made a reasonable, strategic decision in not introducing more specific evidence about Mr. Gardner's past.

Second, during the sentencing phase of *Wiggins*, defense counsel "introduced *no* evidence of Wiggins' life history." *Id.* at 515 (emphasis added). Here, Dr. Heinbecker testified about Mr. Gardner's difficult upbringing at the sentencing phase and his possible brain impairment. While there is a reasonable probability that one juror would have avoided the death penalty upon hearing of Mr. Wiggins' difficult background for the first time, Mr. Gardner's jury heard about his unfortunate life history and decided to sentence him to death anyway. The specifics of his past would not likely have made a significant difference, so no prejudice resulted.

In his Reply Brief, Mr. Gardner also relies on the lead opinion in *Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008), in support of his view that counsel's insufficient preparation and presentation of mental health evidence was prejudicial.[2]  This case is similar to *Wilson* in that trial counsel was ineffective in conducting only a limited investigation into the defendant's mental health and not offering available diagnoses at the penalty phase of trial.  536 F.3d at 1085-86.  But there are significant differences in degree and context, which render that decision distinguishable.  Indeed, even in *Wilson*, the court did not hold that counsel's inadequate preparation and presentation of mental health evidence was necessarily prejudicial, but instead remanded to the district court for an evidentiary hearing on prejudice.  *Id.* at 1096.

First, according to the expert in *Wilson*, the difference between his testimony at trial and what he could have said if he had more time for preparation was "enormous[]."  *Id.* at 1077.  Prior to his testimony, the expert administered tests that suggested a diagnosis of schizophrenia, but the tests were not valid and had to be readministered.  The expert therefore could testify only to diagnoses of bipolar disorder, anxiety disorder, and post-traumatic stress disorder.  *Id.* at 1075.  After trial, on retesting and examination of additional information from other sources, the expert concluded that the defendant suffered from schizophrenia,

---

[2]  Wilson is currently under en banc review, but not with regard to the issue of prejudice.  *See Wilson v. Sirmons*, 2008 U.S. App. LEXIS 27448 (10th Cir. Dec. 2, 2008).

paranoid type, and that it was possible that he was delusional at the time of the crime. *Id.* at 1077. The difference between Dr. Heinbecker's trial testimony and what he could have given after further investigation, by contrast, was purely a matter of degree. To be sure, Dr. Heinbecker could have provided more detailed testimony, but it would not have supported a different diagnosis.

Second, according to the lead opinion in *Wilson*, the evidence that could have been presented was far more likely to influence the jury than that in this case. According to the lead opinion, schizophrenia is likely to be regarded as more mitigating than generalized personality disorders because the latter are inseparable from personal identity and often untreatable. *Id.* at 1094 ("Diagnoses of specific mental illnesses such as schizophrenia or bipolar, which are associated with abnormalities of the brain and can be treated with appropriate medication, are likely to be regarded by a jury as more mitigating than generalized personality disorders, which are diagnosed on the basis of reported behavior, are generally inseparable from personal identity, and are often untreatable through medical or neurological means."). Here, by contrast, even after full investigation the defense expert uncovered no diagnoses that were this potent a form of mitigation. Mr. Gardner did not suffer from hallucinations or delusions. There was only evidence of moderate brain damage, most of which was caused by his own drug use, and Dr. Heinbecker testified with regard to these impairments.

Third, in *Wilson* counsel did not even provide his expert witness an opportunity to testify regarding the diagnoses he had reached, or to explain the significance of those diagnoses to the jury, leading to a disastrous cross-examination in which the defendant was successfully portrayed as a "psychopath," without effective response from the defense. *Id.* at 1076. Nothing of that sort occurred here. Despite the limitations under which he was operating, Dr. Heinbecker did an effective job of conveying mitigating evidence regarding Mr. Gardner's family history, possible organic brain damage, and social circumstances.

Finally, in *Wilson* our standard of review was de novo, and the state provided only a skeletal argument regarding the issue of prejudice. *Id.* at 1079, 1093–95. Here, the Utah Supreme Court decided the prejudice issue on the merits, and the state has fully briefed the prejudice issue.

Thus, in contrast to the result in *Wilson*, we conclude that the Utah Supreme Court's decision that Mr. Gardner was not prejudiced by his counsel's failure to provide Dr. Heinbecker with more time to prepare was not unreasonable.

## C.   Ineffective Assistance on Appeal

We turn now to Mr. Gardner's claim of ineffective assistance by appellate counsel, which is based on counsel's failure to challenge on appeal a faulty jury instruction defining the *mens rea* element for first degree murder. The court gave the following instruction:

A person engages in conduct: (1) "Intentionally" when it is his conscious objective or desire to engage in the conduct or to cause the result; or (2) "Knowingly" when he is aware of the nature of his conduct, *or* the existing circumstances, *or* is aware that his conduct is reasonably certain to cause the result.

Aplt. Br. 37 (emphasis added). Defense counsel did not object to the proposed instruction, but offered their own alternative instruction that was rejected. *Gardner v. Galetka*, 2007 U.S. Dist. LEXIS 25651, at *7–8. The government has conceded that, read in isolation, the "knowingly" definition was erroneous in that it did not require the jury to find that Mr. Gardner acted knowingly with respect to his conduct *and* the result. *See State v. Standiford* 769 P.2d 254, 260 n.3 (Utah 1998) (describing the mental state for first degree murder as the "purpose to kill"). The government argues, however, that no prejudice resulted. Mr. Gardner claims his appellate counsel provided ineffective assistance by not raising this issue on appeal.

Because this issue was not raised in state court on direct appeal or on application for post-conviction relief, the district court held the claim in abeyance while Mr. Gardner exhausted the claim in state courts. The Utah Supreme Court held that the claim was procedurally barred because it was not raised on direct appeal. *Gardner v. Galetka*, 94 P.3d 263 (Utah 2004) [*Gardner III*]. In reaching this conclusion, the state court applied Utah's 1996 Post-Conviction Remedies Act (PCRA). *Id.* at 268. Mr. Gardner, however, filed his initial state post-conviction petition in 1990, before the 1996 Post-Conviction Remedies Act was enacted.

-41-

Accordingly, the federal district court certified the following question to the Utah Supreme Court: "If Mr. Gardner had raised the ineffective assistance of counsel claim at issue in *Gardner v. Galetka*, 94 P.3d 263 [*Gardner III*], in state court in a successive petition in 1990, would the petition have been procedurally barred?" The Utah Supreme Court responded affirmatively. *Gardner v. Galetka*, 151 P.3d 968 (Utah 2007) (*Gardner IV*). According to the *Gardner IV* court, the court would have dismissed the claim in 1990 based on the determination that Mr. Gardner's claim "could have been raised in a prior post-conviction proceeding" and that it did not fall within the common law "good cause" exception because it was "facially implausible" or "frivolous." *Id.* at 973-74. "There is no 'good cause' that justifies bringing before a court a frivolous post-conviction claim. Indeed, there is no 'fundamental unfairness' in dismissing a frivolous claim." *Id.* at 974. The Utah Supreme Court characterized this rule as "procedural" because the bar was based on the successive nature of the petition.

The federal district court disagreed. The court reasoned that a threshold finding of frivolousness is "interwoven with federal law." *Gardner*, 2007 U.S. Dist. LEXIS 25651, at *17. Thus, the court concluded that such a threshold finding required an examination of the merits, which precludes finding that the claim is procedurally barred under federal law. However, without addressing the deficiency prong, the court dismissed his claim because Mr. Gardner had failed to establish prejudice. *Id.*

We do not agree with the district court that the Utah Supreme Court's dismissal of the appellate ineffectiveness claim cannot be regarded as a procedural bar to federal habeas review. To be sure, the Utah court's frivolousness determination itself involves the merits of his jury instruction claim. *See Backstrom Family Ltd. P'ship v. Hall*, 751 P.2d 1157, 1160 (Utah Ct. App. 1988) (the frivolousness inquiry requires a court to determine if a claim is "without reasonable legal or factual basis"). But the frivolousness inquiry is not the bar; it is an element of the exception to the bar. The reason the Utah court would not entertain Mr. Gardner's claim based on the jury instruction is that he failed to raise it as part of his first post-conviction petition, even though he could have done so. This is undoubtedly procedural. We do not think that a state's decision to allow exceptions to its procedural bar in the interest of preventing "fundamental unfairness," which requires an examination of the merits, makes the underlying bar any less procedural. If this were so, any procedural bar with an exception based on avoiding a fundamental miscarriage of justice would lose its character as an independent procedural ground under *Michigan v. Long*, 463 U.S. 1032 (1983). But we need not resolve this question, because we agree with the district court that Mr. Gardner's claim that the faulty jury instruction was harmful error fails on the merits.

"A misstatement of an element in jury instructions is subject to harmless error analysis on habeas review." *Scoggin v. Kaiser*, 186 F.3d 1203, 1207 (10th

Cir. 1999). Error is harmless if it "appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999) (internal quotations and citation omitted). The Utah Supreme Court concluded that it was "absurd" to suggest that any reasonable juror could reach a different verdict based on a proper jury instruction. 151 P.3d at 974. Because, as we have said, the Utah Supreme Court's frivolousness determination was a decision on the merits of the jury instruction claim, it warrants AEDPA deference. Under the circumstances here, we agree with the Utah Supreme Court that the faulty instruction could have had no effect on the outcome.

When returning the verdict, the jury foreman stated that the jury unanimously found Mr. Gardner had killed Mr. Burdell "for the purpose of effecting [his] escape . . . from lawful custody." Vol. XLIX, 2598. Thus, the jury must have concluded that Mr. Gardner intentionally shot Mr. Burdell, knowing that it would allow him to escape. Mr. Gardner does not dispute this conclusion. He argues, however, that in light of the instruction, it is not clear whether the jury found that he was "aware that his conduct [was] reasonably certain to cause the result," that is, Mr. Burdell's death. In other words, given the disjunctive formulation of the instruction, the jury could have found that Mr. Gardner fired the bullet at Mr. Burdell for the purpose of effectuating an escape, but without intending or even knowing that the result would be Mr. Burdell's death.

Even if there was such an ambiguity, we agree with the district court that no reasonable juror "would find, given the totality of the evidence, that Mr. Gardner was aware of his conduct but was not reasonably certain that firing a loaded .22 caliber handgun directly into Mr. Burdell's head at point-blank range would result in Mr. Burdell's death." *Gardner*, 2007 U.S. Dist. LEXIS 25651, at *29. The jury unquestionably found that Mr. Gardner intended to pull the trigger. Under the circumstances, death was reasonably certain to result. Thus, the state court was not unreasonable in finding that the erroneous jury instruction resulted in harmless error.

## D.    Conflict of Interest Claim

Mr. Gardner next alleges that his representation suffered from a conflict of interest that deprived him of a fair trial. At trial, Mr. Gardner was represented by two brothers, Andrew and James Valdez. On the day of the courthouse shooting, each brother arrived separately at the scene. Having heard that Mr. Gardner had killed an unnamed attorney, each was fearful that the other might have been the victim. When each of them encountered Mr. Gardner, he inquired after the whereabouts of his brother.

Before the district court, Mr. Gardner asserted the existence of a conflict of interest on the basis of a variety of factual allegations, see Mag. Rep. 21. On appeal, however, he argues only that the conflict of interest stemmed from "the victimization of the Valdez brothers." Aplt. Br. 78. Mr. Gardner alleges that this

"victimization" occurred because of the Valdez brothers' fear for each other's safety after the courthouse shooting, as well as the fact that the Valdezes were familiar with some witnesses to and victims of the event.[3]  *See id.*  The Utah Supreme Court rejected these arguments on the merits, in large part because Mr. Gardner could not demonstrate the existence of any deleterious impact on his representation.  *See Gardner II*, 888 P.2d at 621–22.  The district court concluded that the Utah Supreme Court's conclusion was a reasonable application of federal constitutional standards.  Mag. Rep. 26–31.  We agree.

The right to counsel guaranteed by the Sixth Amendment includes the right to representation that is free from conflicts of interest.  *United States v. Bowie*, 892 F.2d 1494, 1500 (10th Cir. 1990).  "In the context of a conflict of interest claim where there was no objection at trial . . . the client must demonstrate an actual conflict of interest which adversely affected his lawyer's performance."  *United States v. Alvarez*, 137 F.3d 1249, 1251 (10th Cir. 1998) (citation omitted).  If the client can establish the conflict actually affected the adequacy of his representation, prejudice is presumed.  *Id.*  The client has the burden of showing

---

[3]The government argues that this claim was not raised before the district court and therefore is waived.  There is some evidence, however, that the substance of this claim was raised before the district court.  *See, e.g.*, Vol. XIV, Doc. 607 at 5 (elaborating on idea that "the Valdez brothers themselves were victims of the crime").  Because we conclude that this claim fails on the merits, we need not resolve whether it was waived.

-46-

specific instances to support his contentions of an actual conflict adverse to his interests. *Id.*

Mr. Gardner primarily points to Andrew Valdez's closing statement at his trial as evidence of the alleged conflict of interest. During his closing statement, Mr. Valdez described his personal fear on the day of the shooting, when he was anxious for his brother's whereabouts and safety. *See* Vol. L 2880 (Trial Tr. 1661) ("I got this fear because I hadn't seen my brother . . . and I was so fearful at that point. And I went looking for [James] in the crowd. I didn't know it, but he had done the same thing. He had gotten there and had asked, 'Where is Andy?' He thought I had been killed. We found each other and rejoiced in each other's safety, and the fear subsided.") Mr. Gardner argues that this suggests that trial counsel was unable to zealously advocate for him. But this ignores the thrust of Mr. Valdez's argument, by which he was attempting to convince the jury to *set aside* its fear when sentencing Mr. Gardner, just as he had set aside his fear and determined to continue representing Mr. Gardner because he "believe[d] in saving his life." *Id.* at 2881 (Trial Tr. 1662). In other words, Mr. Valdez was arguing to the jury that just as he himself had been able to put aside his fear, the jury should and must do so in order to make a rational sentencing judgment. *See id.* at 2880–81 (Trial Tr. 1661–62) ("[I]f, in fact, you fall for the fear tactic, I would submit to you that that is not a rational basis to kill this man.").

In context, Mr. Valdez's argument does not support the claim that his ability to represent Mr. Gardner was adversely affected by the impact of the courthouse shooting. If anything, it indicates that Mr. Valdez was attempting to use his experience to convince the jury to sentence Mr. Gardner to life imprisonment, rather than death. Because Mr. Gardner has failed to demonstrate any adverse effect from his attorneys' representation, he cannot prevail on his conflict of interest claim.

Mr. Gardner separately argues that the trial court erred by failing to hold an evidentiary hearing on this potential conflict of interest when the issue arose. Even assuming the trial court knew or reasonably should have known about the existence of a conflict, however, Mr. Gardner still would have to show that the conflict of interest "adversely affected his counsel's performance" in order to obtain habeas relief. *Mickens v. Taylor*, 535 U.S. 162, 174 (2002). As he has failed to make this showing, this claim also fails.[4]

---

[4]Because we conclude that Mr. Gardner is unable to demonstrate the existence of a conflict of interest sufficient to warrant habeas relief, we need not evaluate whether the district court was correct to conclude that he waived any conflict that might have existed. Nevertheless, we note that a client may generally waive his right to conflict-free representation, when done voluntarily, knowingly, and intelligently. *See Estelle v. Smith*, 451 U.S. 454, 471 n.16 (1981). The original trial record implies that such a waiver occurred in this case. *See* Vol. L. 2881 (Trial. Tr. 1661) ("[The defendant] still, in spite of the possible conflicts, wanted us to defend him because we believe in saving his life.").

**E. Change of Venue**

Before trial, Mr. Gardner moved for a change of venue, arguing that the pretrial publicity about his attempted escape and the shooting made it impossible for him to receive a fair trial in Salt Lake City. In support of his motion, Mr. Gardner submitted several dozen newspaper articles and videotapes of local broadcasts typifying the publicity. Mr. Gardner also relied on a survey, commissioned by his counsel, of approximately four hundred registered voters in Salt Lake City, concerning their knowledge of and reaction to the crime. *See* Aple. Br. 87–88. The survey purported to show that ninety percent of respondents thought that the defendant was either "guilty" or "probably guilty." *Gardner I*, 789 P.2d at 277. Mr. Gardner finally took issue with the fact that his trial was held in the county courthouse, across the street from the building where the shooting had taken place.

The trial court denied Mr. Gardner's initial motion for a change of venue based on pretrial publicity, but left open the opportunity to renew the motion. Aple. Br. 89. The trial judge then conducted five days of voir dire, during which he asked the prospective jurors about their ability to remain impartial, asked them to explain any outside information that they had learned about the case, and allowed both prosecution and defense to conduct further examination. *Id.* After the jury was selected, Mr. Gardner renewed his motion for a change of venue and it was again denied.

Mr. Gardner raised the venue issue on direct appeal to the Utah Supreme Court, which affirmed the trial court. *Gardner I*, 789 P.2d at 277–78. Although the court acknowledged that many prospective jurors had been exposed to the basic facts of the courthouse shooting, it determined that this exposure did not warrant a presumption of prejudice. It noted first that a venire's exposure to the fundamental facts of an incident does not presumptively deprive a defendant of due process. *See id.* at 277 (citing *Murphy v. Florida*, 421 U.S. 794, 799 (1975)). Second, it pointed out deficiencies in the survey conducted by Mr. Gardner, which diminished the inferences that might be taken from its results. *See id.* In particular, the court noted—and Mr. Gardner acknowledged—that when asked whether the defendant was "guilty," the survey taker gave no explanation of what crime the defendant was charged with or what burden of proof the state was required to meet. *Id.* As a result, the Utah Supreme Court found that "any lay opinion as to guilt [indicated by the survey] was merely an affirmation that [Mr. Gardner] was the person involved in the incident, a fact conceded by the defense." *Id.* Finally, the court explained that Mr. Gardner had not alleged any specific prejudice from the proximity of his trial to the courthouse where the shooting had taken place. For all these reasons, it concluded that the trial court had not abused its discretion in concluding that prejudice could not be presumed, and therefore denying the request for change of venue. *Id*. at 278. The federal district court found that the Utah Supreme Court's decision did not represent an unreasonable

application of clearly established Supreme Court law. *See* Mag. Rep. 151; *Gardner*, 2007 U.S. Dist. LEXIS 25643, at \*13. We agree.

This court's precedents are not entirely consistent with regard to the standard of review to apply to a state court's decision regarding jury impartiality. *Compare Goss v. Nelson*, 439 F.3d 621, 627 (10th Cir. 2006) (stating that only when a manifest error occurs can a federal habeas court overturn a state court's finding regarding jury impartiality as a whole), *with Hale v. Gibson*, 227 F.3d 1298, 1331 (10th Cir. 2000) (asking whether state supreme court's finding that trial court did not abuse its discretion in rejecting change of venue was an unreasonable application of Supreme Court precedent); *see also Patton v. Yount*, 467 U.S. 1025, 1031 n.7 (1984) (declining to decide whether it is appropriate for a reviewing court to apply a "manifest error" standard or to follow the ordinary level of deference afforded state supreme court decisions on habeas relief). In this case, because we find that the same result would follow from either standard, we need not resolve which standard is appropriate.

The Sixth Amendment, applied to the states by the Fourteenth Amendment, ensures that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . trial[] by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. Due process may require a change of venue stemming from the "presumed prejudice" following from pretrial publicity in two related contexts. First, where pretrial publicity is so pervasive and

prejudicial that a court could not expect to find an unbiased jury pool in the community, it should "presume prejudice," necessitating a venue change. *Goss*, 439 F.3d at 628. Second, change of venue may be required where the effect of pretrial publicity manifested at jury selection is substantial enough to indicate the existence of prejudice within the jury pool. *Id.*

We consider first Mr. Gardner's claim that the pretrial publicity alone raised a presumption of prejudice. This is rarely the case. *See United States v. Abello-Silva*, 948 F.2d 1168, 1177 (10th Cir. 1991) ("Presumed prejudice is rarely invoked and only in extreme situations."), abrogated on other grounds by *United States v. Bagley*, 473 U.S. 667 (1985). "[P]rejudice will only be presumed where publicity 'created either a circus atmosphere in the court room or a lynch mob mentality such that it would be impossible to receive a fair trial.'" *Goss*, 439 F.3d at 628 (quoting *Hale*, 227 F.3d at 1332). "Simply showing that all the jurors knew about the case and that there was extensive pretrial publicity will not suffice . . . ." *Hale*, 227 F.3d at 1332 (quoting *Stafford v. Saffle*, 34 F.3d 1557, 1567 (10th Cir. 1994)).

The Supreme Court has presumed prejudice from pretrial publicity alone only in exceptional settings—where the trial became "a hollow formality" or when the courthouse proceedings were overrun by the press "to accommodate the public appetite for carnival." *Murphy*, 421 U.S. at 799. *See, e.g.*, *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (massive publicity insisted that defendant was guilty;

-52-

veniremen's names were published and prospective jurors were inundated by calls and letters); *Estes v. Texas*, 381 U.S. 532 (1965) (circus atmosphere created when pretrial hearings were broadcast live to community and at least twelve cameramen took motion or still pictures throughout the proceedings); *Rideau v. Louisiana*, 373 U.S. 723 (1963) (sheriff videotaped defendant's detailed jailhouse confession—taken during "kangaroo court" proceedings without lawyer present—and assisted in broadcasting it numerous times to relatively small community).

Although the courthouse shooting generated significant pretrial publicity, Mr. Gardner points to nothing that suggests his trial devolved into a "circus." Both the pretrial publicity and the survey conducted by the defense illustrated only that it was widely known that Mr. Gardner was involved in the courthouse shooting—a fact already conceded by the defense. *See Gardner I*, 789 P.2d at 277. It did not indicate that members of the venire had developed a fixed opinion as to whether Mr. Gardner's actions satisfied the legal standard for first degree murder. Nor was there any harassment of veniremen or indication that the media had so pervaded the proceedings as to create a carnival-like atmosphere.

As we have previously explained, "[P]re-trial publicity in topical criminal cases is inevitable." *Abello-Silva*, 948 F.2d at 1176. If we were to require the relocation of every trial following a crime about which multiple stories were broadcast or published, the local trial of newsworthy cases would become the

exception rather than the rule. Here, Mr. Gardner points to no circumstances so exceptional as to suggest that Mr. Gardner was unable to obtain a fair trial in Salt Lake City. Therefore, we cannot say that the Utah Supreme Court unreasonably concluded that a change of venue on the basis of pretrial publicity alone was unnecessary.

Mr. Gardner also fails to demonstrate that jury selection manifested such prejudice as to deprive him of a fair trial. A change of venue is warranted when "the jurors demonstrated actual partiality or hostility that [could] not be laid aside." *Jeffries v. Blodgett*, 5 F.3d 1180, 1189 (10th Cir. 1993). "We review [for prejudice based on jury selection] by examining the totality of the circumstances," *Stafford*, 34 F.3d at 1567, bearing in mind that "[t]he trial court has broad discretion in gauging the effects of allegedly prejudicial publicity and in taking measures to insure a fair trial." *Abello-Silva*, 948 F.2d at 1177. We may consider both the jury's responses to voir dire, as well as the nature and extent of the questions asked by the judge to ensure an impartial jury. *See id.* at 1177–78.

Evidence of community sentiment at jury selection has been used to invalidate a conviction in the rare situation when voir dire indicates that the pretrial publicity had such a pervasive effect that a fair jury could not be seated. In *Irvin v. Dowd*, 366 U.S. 717 (1961), for instance, the Supreme Court invalidated a conviction where (1) the trial court had excused over half of the venire for cause due to fixed opinions as to the defendant's guilt, (2) ninety percent of jurors

-54-

entertained some opinion as to guilt, and (3) eight of twelve jurors actually seated "thought defendant was guilty." *See Goss*, 439 F.3d at 629 (describing *Irvin*).

In recent years, the Supreme Court has made clear, however, that community prejudice should be inferred from voir dire only in exceptional cases. Thus, in *Patton v. Yount*, 467 U.S. 1025 (1984), the court found there was no manifest error in refusing to change venue even though (1) pretrial publicity revealed inadmissible information such as defendant's prior conviction for murder and confession; (2) seventy-seven percent of jurors admitted they had an opinion about defendant's guilt; and (3) eight of the fourteen jurors and alternates actually sat had an opinion as to guilt. *See Goss*, 439 F.3d at 629 (describing *Patton*).

In this case, although roughly fifty-five percent of jurors professed that they had formed an opinion about Mr. Gardner's guilt, Aplt. Br. 83, only four of twelve actually seated jurors indicated that they had formed an opinion to guilt—even fewer than in *Patton*. Of equal importance is the conscientiousness with which the trial judge worked to seat an impartial jury. "Voir dire examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991). The trial judge ably advanced both these goals through his conduct of voir dire in this case. Over five days, the trial court examined each of the prospective jurors personally about their knowledge of the facts of the case, as well as their ability to set aside pre-formed opinions and try the case solely on the

-55-

evidence introduced at trial. The judge also inquired into the source and content of media information to which the venire had been exposed. Finally, he allowed counsel for both the prosecution and the defense to further question prospective jurors about their exposure to pretrial publicity. As a result, every member of the venire ultimately placed on the jury had assured the trial court that he or she could decide the case on the presented evidence alone.

The inference of actual prejudice here is no stronger than in other cases where we have rejected such claims. *See, e.g.*, *Hale*, 227 F.3d at 1333 (affirming finding of no actual prejudice where trial occurred five to six months after crime, half of seated jury had opinions as to guilt or innocence, and trial judge asked only twice whether there were any jurors who felt they could not be impartial). Given the extent of the trial court's inquiry, as well as the nature of jurors' responses to those questions, we cannot say that the "high hurdle" necessary to establish the presence of prejudice has been met in this case. *Goss*, 439 F.3d at 630. Consequently, the facts do not establish either manifest error or that the Utah Supreme Court unreasonably applied Supreme Court precedent by rejecting claims of actual prejudice on the basis of jury selection.

## F.     Security Measures and Shackling

Mr. Gardner also argues that the security measures taken during his trial—including the presence of four security officers wearing bulletproof vests, electronic screening devices at the courtroom entrance, escorts for the jurors to get

to their cars after dark, and, most importantly, visible shackles—violated his Sixth Amendment right to a fair trial by labeling him in the jurors' eyes as particularly dangerous. To determine whether the presence of security measures in the courtroom violates the Sixth Amendment, we normally ask "whether what [the jurors] saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." *Holbrook v. Flynn*, 475 U.S. 560, 572 (1986). Shackling, however, is deemed inherently prejudicial, *Illinois v. Allen*, 397 U.S. 337 (1970), and should be allowed only if "there are compelling reasons which would justify the use of physical restraints" such that the Sixth Amendment rights "yield to the competing interests of the courtroom participants for the safe conduct and orderly progress of the trial." *United States v. Hack*, 782 F.2d 862, 867 (10th Cir. 1986).

In *Hack*, we held that the trial court had not abused its discretion when it shackled two defendants who were on trial for attempting to forcibly hijack a prison transport plane and effect their escape. *Id.* at 867–68. Mr. Gardner posed a nearly identical situation. He not only had a history of violence, but was on trial for a murder committed while attempting to escape from a courthouse. The judge was justified in taking precautions to prevent another attempt. Mr. Gardner nonetheless attempts to distinguish *Hack* by noting that the judge in that case had "weighed all relevant factors based on the uncontroverted information available to

him in considering the most appropriate precautionary measures" and his reasons were "sufficiently documented." *Id.* at 868. Here, in contrast, the only record of the trial court considering what security measures would be appropriate arose when, mid-trial, Mr. Gardner objected to the presence of security guards within the courtroom and the court took steps to limit their visibility. We do not take the lack of detailed findings to mean that the court had abdicated its duty to weigh the need for precautions against the costs to Mr. Gardner, though, or to mean that the court was unjustified in allowing these extreme security measures. More likely it is the result of Mr. Gardner's not objecting to the security until the trial was well underway, and even then to object to only one particular measure, which the court immediately addressed. As Mr. Gardner had a history of violent escape attempts, the court had compelling reasons that justified these security precautions, and Mr. Gardner's Sixth Amendment rights had to yield to the competing interest of ensuring the safety of the trial participants.

## G. Hypnotically Refreshed Testimony

Unbeknownst to both Mr. Gardner and the prosecution, Mr. Macri, one of the witnesses to the shooting in the archive room, underwent hypnosis between testifying at the preliminary hearing and testifying at trial. Mr. Gardner argues that Mr. Macri's post-hypnotic testimony violated his rights under both the Due Process and Confrontation Clauses. We have rejected the per se constitutional invalidity of hypnotically-refreshed testimony, *Robison v. Maynard*, 829 F.2d

-58-

1501, 1508 (10th Cir. 1987), overruled on other grounds by *Romano v. Gibson*, 239 F.3d 1156 (10th Cir. 2001), but we have also said that "[a] reviewing court must determine whether safeguards have been employed to insure reliability of the testimony to make it admissible." *Id.*; *see also id.* at 1508, n.8 (identifying some of the safeguards that had been present, such as making a record of the hypnotic session and performing the hypnosis in a manner designed to "minimize the danger of contamination"). This case, however, is quite different from the usual instances of hypnotically-refreshed testimony, as the hypnosis was not undertaken at the behest of the state but at the witness's own initiative, without the state's knowledge and without its ability to ensure safeguards.

The Utah Supreme Court did not address whether the hypnosis amounted to a constitutional error, but instead found that Mr. Gardner was not prejudiced by any error that might have occurred, as Mr. Macri's testimony "went only to a collateral issue that was, at most, marginally related to Gardner's defense." *Gardner II*, 888 P.2d at 614. We agree. At the preliminary hearing, before undergoing hypnosis, Mr. Macri testified that he was standing behind a door when Mr. Gardner entered the archives room, and that he fled by going around the door. He testified, somewhat uncertainly, that as the door closed behind him, the gun went off, and that the events occurred simultaneously. At trial, after undergoing hypnosis, Mr. Macri testified with much more certainty that "simultaneous doesn't quite describe the motion." Mr. Gardner contends that this change in testimony

was prejudicial because the pre-hypnosis testimony supported the theory that the door slammed shut before the gun went off, suggesting that he fired because he was startled by Mr. Macri rushing out the door. Pre-hypnosis, Mr. Macri was a bit uncertain about the order of events but testified that his running out the door and hearing the gunshot all happened at about the same time, whereas after hypnosis he was more certain that the gun went off before the door closed behind him. In both versions, though, the door had already started to close before Mr. Gardner fired the gun, and both supported Mr. Gardner's startle theory and his own testimony that he had seen "a blur in front of [his] eyes" (i.e., Mr. Macri) and heard "another explosion." Whether or not the use of post-hypnotic testimony was a constitutional violation, the slight difference in testimony the hypnosis may have produced was not enough to prejudice Mr. Gardner.

## H. Witness Tampering

Mr. Gardner claims that the other eyewitness to the shooting, Kenneth Seamons, was "manipulated" by the prosecutor into altering his testimony during trial. An examination of what actually happened, however, belies any inference of prosecutorial indiscretion. At trial, Mr. Seamons testified that Mr. Gardner had pointed the gun at Mr. Burdell, and that "[t]he gun went off." The trial then recessed for lunch. At lunch, the prosecutor told Mr. Seamons that he was "being too polite" in saying that the gun went off, and that "either [Gardner] did or he didn't" pull the trigger. He did not instruct Mr. Seamons to lie or even to change

his testimony, but only instructed him to tell how it happened.  After lunch, Mr.

Seamons then clarified that "Gardner shot Burdell"—testimony that was not

inconsistent with his earlier testimony.  Showing a witness how his phrasing could

be misinterpreted and then instructing that witness to "tell how it happened" is not

witness tampering, but being a good lawyer.

## I.    Bifurcation

Utah law provides that aggravated murder can be a capital felony.  One way

in which a murder can be aggravated is if "the actor was previously convicted of"

certain crimes.  Utah Code Ann. § 76-5-202(1)(j).  Mr. Gardner argues that the

failure to have a bifurcated trial for his aggravating circumstances—two prior

robbery convictions—prejudiced him.  He cites *State v. James*, 767 P.2d 549, 557

(Utah 1989), which held that "[w]hen the underlying crime is charged, and

enhancing circumstances involving other crimes . . . are also charged for the

purpose of increasing the severity of the punishment for the underlying crime, *the*

*trial court must divide the trial into separate segments*." (emphasis added) (citing

*State v. Bishop*, 753 P.2d 439, 498 (Utah 1988)).  Admitting prior crimes is

"presumed prejudicial" to the defendant.  *Id*. at 557.

Mr. Gardner says that the failure to bifurcate violated his "fundamental

rights and constitutional guarantee of not having his death sentence imposed in an

arbitrary and capricious manner."  Aplt. Br. 104.  Mr. Gardner cites no direct

authority tying the right established in *James* (decided after Mr. Gardner's trial) to a federal right.

In the state supreme court, concurrences by Justices Stewart and Zimmerman asserted that, in allowing the evidence of Mr. Gardner's two prior robberies, the trial court erred. *Gardner I*, 789 P.2d at 289. Justice Zimmerman, however, reasoned that the error was harmless. First, Justice Zimmerman stated that the prosecutor referred to the two robberies "only as necessary to demonstrate that the State had proven the aggravating element of first degree murder." *Id.* at 290 (Zimmerman, J., concurring). Second, Justice Zimmerman noted that Mr. Gardner referred to his past crimes when he was on the stand. *Id.* Mr. Gardner "took the stand and disclosed his extensive criminal record, which included other convictions that were more prejudicial than the two robberies." *Id.* Evidence of Mr. Gardner's prior crimes were thus admissible in order to impeach Mr. Gardner, as his counsel concedes. Aplt. Br. 105. The defendant shrugs this off as the product of ineffective assistance of counsel, but we have rejected that claim above. *See supra* at 25-26.

Both of these reasons echoed ones given by the majority. *Gardner I*, 789 P.2d at 279–80. In addition, the majority claimed that "because defendant's guilt was manifest by overwhelming direct evidence" there was no risk that the inclusion of his prior convictions would have had any prejudicial effect on the conduct or outcome of the trial. *Id.* at 279.

We find these three reasons persuasive and conclude that the failure to bifurcate the trial did not unfairly prejudice Mr. Gardner.

**J.      Failure to Instruct on All Statutory Mitigating Factors**

Mr. Gardner makes the strained argument that the jury should have been instructed that he may have "acted under extreme duress." Utah Code Ann. § 76-3-208(2)(c) (1990). Mr. Gardner says the jurors could have concluded that Mr. Gardner "was in a state of physical duress," Aplt. Br. 107, as a result of his gunshot wound and his general panic. This is not a convincing argument.

First, the statutory factor would seem to apply only to cases where a person is acting under the duress placed on him or her by another, not when any abstract "force" (such as pain or disorientation) is working on the person. Mr. Gardner cites the unpublished case, *Horton v. Massie*, 203 F.3d 835 (Table), 2000 WL 107386 (10th Cir. 2000), in which a person was threatened with death or physical injury by another. This, however, seems the classic instance of duress contemplated by the statute. *See* Utah Code Ann. § 76-3-207(2)(c) (mitigating circumstance if "[t]he defendant acted under extreme duress or under the substantial domination *of another person*." (emphasis added)). Physical duress by gunshot wound, in contrast, is a stretch. No one forced or coerced Mr. Gardner into firing a shot.

Second, the instruction to the jurors allowed them to consider "any other fact in mitigation of the penalty." Utah Code Ann. § 76-3-207(2)(g). They

-63-

certainly could have considered Mr. Gardner's extreme physical duress, especially if this was a central theme of his defense, as he alleges. Aplt. Br. 107. The court also instructed the jury that the mitigating factors it listed were merely examples and not exclusive. Aple. Br. at 119 (quoting R. 613–17). This is all that was required of it. *See Bryson v. Ward*, 187 F.3d 1193, 1209–10 (10th Cir. 1999). We see no error.

## K.    Presumption of Death

The judge instructed the jury in this case that: "When in the course of your deliberations you either reach a unanimous verdict of death, or you become reasonably satisfied that such a unanimous verdict will not be rendered, you will notify the bailiff that you are ready to report to the Court." Vol. LIX, Additional Instructions, 6. The instruction also said:

> Your verdicts must be either:
>
> We the jury impaneled in the above case having heretofore found the defendant guilty of Criminal Homicide, Murder in the First Degree, Count I of the Information, unanimously render a verdict of death; or
>
> We the jury impaneled in the above case, Count I of the Information find that our deliberations have been concluded and we are reasonably satisfied that we will not reach a unanimous verdict of death.
>
> The foreman will sign the appropriate verdict, and not the other, and bring both verdict forms back into the Court.

*Id.* at 7. Mr. Gardner claims that the jury instructions could reasonably have been read as requiring unanimity for the jury to decide *not* to impose the death penalty,

and that this amounts to a constitutional violation. Aplt. Br. 110 (citing *McKoy v. North Carolina*, 494 U.S. 433, 442–43 (1990)). Mr. Gardner contends that the jurors should have been told that an individual juror could exercise his own judgement and give full effect to a mitigating circumstance, even though other jurors did not.

The magistrate judge found that there was nothing in the jury instructions indicating that "the jury must unanimously find mitigating circumstances to exist." Mag. Rep. 227. Moreover, the jury instructions above are clear that unanimity is only required for the death penalty to be imposed; if the jury is not unanimous on that point, then they will reach the alternative verdict (a life sentence). Indeed, as the magistrate judge explained, "[t]he only time the instructions provide that the jury must be unanimous is in their explanation of how the jury could impose a sentence of death." Mag. Rep. 227–28. The district court adopted the reasoning of the magistrate judge, and we agree that no reasonable juror could have construed the instructions to require the jury to be unanimous in order not to impose a sentence of death.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the decision of the district court.